THE CITY OF BRIDGEPORT *vs.* THE AETNA INDEMNITY COMPANY (THEODORE H. MACDONALD, INSURANCE COMMISSIONER, *vs.* THE AETNA INDEMNITY COMPANY).

*Third Judicial District, Bridgeport, October Term, 1916.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

The liability of an indemnity company upon its bond, given to secure the faithful performance of a contract between its principal, a by-products company, and a city, for the reduction of the latter's garbage and offal during a period of ten years, accrues when the company ceases its operations and refuses to receive further garbage, that is, when it commits a breach of its undertaking.

An action to recover damages consequent upon such breach may be brought by the city at once, or at any later time within the statute of limitations; but one action only can be brought, and therein recovery may be had for all damages, future as well as past.

The mere fact that future damages are difficult of ascertainment, does not prevent a recovery of them, nor does it convert the city's claim from an accrued or matured one into a contingent demand.

A recovery in such an action would not be defeated even if it did not appear that any damage had been sustained by the city up to the time its suit was brought or hearing had, provided it did appear reasonably certain that loss or damage would result in the future.

In the present case a receiver was appointed for the defendant indemnity company, but not until several months after its principal had broken its contract with the city. *Held* that the liability of the

*Transferred from first judicial district.

Bridgeport *v.* Aetna Indemnity Co.

indemnity company became a fixed and absolute obligation the moment the by-products company committed its breach, and that the obligation thus established continued until paid or otherwise discharged.

On behalf of the indemnity company it was contended that its principal was justified in refusing to longer receive and reduce the garbage, since the city repeatedly delivered to it garbage which contained some foreign matter. *Held* that this contention was not supported by the terms of the contract, nor was it in accord with the intention of the parties at the time the agreement was executed, in so far as such. intent was indicated by the facts found by the committee.

After a cause of action for an unqualified breach of contract has accrued, a subsequent offer to perform, made by the delinquent party, will not nullify the breach and revive the original agreement. The offer, if relevant at all, can only affect the question of damages.

It appeared that the city had not for several years delivered to the by-products company all of the dead animals found in the city as provided in the contract, but no complaint was made of this omission nor was the attention of the municipal authorities called to it, until the city was notified by the by-products company that it was about to suspend further operations. *Held* that the committee was justified in finding, as it did, that this did not furnish a sufficient excuse for the by-products company's attempted rescission of the contract.

The committee found and reported that the city's damages were $20,786. The indemnity company asserted, and the trial court in its memorandum of decision apparently agreed, that these figures were obtained by multiplying the garbage tonnage after a certain date by the difference in price, paid for reduction under the original contract (50 cents) and that larger price ($1) paid under the subsequent contract. *Held* that while such a method, unexplained, would appear to be without justification, since the later contract was in some respects apparently more favorable to the city, there was nothing in the committee's report to warrant the inference or assumption that such method was in fact pursued; and that if the receiver of the indemnity company thought a wrong rule for the assessment of damages had been adopted, or that the committee had erred in applying the right rule, he should have remonstrated against the acceptance of the report and asked for its recommitment so that it would show what rule had been adopted and how the committee had proceeded in its application.

Argued October 26th—decided December 19th, 1916.

INTERVENING APPLICATION in receivership proceedings by the plaintiff, an alleged creditor of the defendant-

company, praying for the allowance of its claim of $10,000, brought to the Superior Court in Hartford County and referred to a committee who found and reported the facts; the court, *Greene, J.*, accepted the report and disallowed the claim, and the plaintiff appealed. *Error and cause remanded.*

January 7th, 1911, the Superior Court in Hartford County appointed a receiver for the Aetna Indemnity Company, then insolvent. In the course of the settlement of its affairs the City of Bridgeport presented to the receiver its claim for $10,000, which sum it alleged was due to it from the insolvent company by reason of its execution as surety of a bond in that amount, given to the city to secure the faithful performance of a contract entered into between it and the Bridgeport By-Products Company. The receiver having disallowed the claim, the city appealed to the court for its allowance. A committee was thereupon appointed to hear and report upon the facts. Upon that report, which was accepted without remonstrance, the court disallowed the claim.

The somewhat lengthy report of the committee finds the following salient facts:—

The contract of the By-Products Company, whose performance the bond was given to secure, was one entered into May 27th, 1904, between one Winton and the City of Bridgeport for the reduction of the city's garbage, offal and dead animals, for a period of ten years from date. In it the city agreed to collect and deliver to Winton's reduction plant for said period, "all garbage, offal and the bodies of such dead animals and similar waste matter accumulated in said City of Bridgeport (as it legally can) and that the same shall be unloaded at such reduction plant at a point designated by Winton." Winton agreed to reduce the same, or under certain temporary conditions bury it, for fifty

cents per ton. One paragraph of the contract was as follows: "It is hereby further agreed that the words 'garbage and offal' shall mean as a general definition, such refuse matter as accumulates in the preparation of food for the table and also all matter arising from the slaughter, preparation, sale or offering for sale of animal, bird and fish food substances that is rejected, unclaimed or abandoned by the owner, or that is tainted, decayed, unwholesome, diseased or offensive."

By the terms of the contract Winton was permitted to form a corporation to be known as "The Bridgeport By-Products Company" to take over the contract, and be substituted for him therein. This was done, and the organization of the company completed on January 5th, 1905. January 9th, 1905, the company delivered to the city its bond in the penal sum of $10,000 signed by the Aetna Indemnity Company as surety, conditioned that the By-Products Company should well and truly keep and perform all the terms and conditions of said contract on its part to be kept and performed, and indemnify and save harmless the city thereunder.

Thereafter the By-Products Company entered upon the execution of its contract, and received the garbage and other waste matter delivered to it by the city, and reduced the same at its plant, and continued to do so until May 11th, 1910, when, pursuant to notice given a few days prior, it ceased operations and refused to receive any more garbage.

From the date of the execution of the contract certain foreign matter was contained in the garbage collected and delivered by the city. This foreign matter was of a character which interfered with the process of reduction, was injurious to the machinery of reduction, and produced no valuable by-product. It at no time amounted in weight to more than five per cent of the total garbage delivered. It was physically impossible to

gather the garbage of the city without including such proportion of foreign matter with it, and five per cent is a fair and reasonable amount to be found in any municipal garbage, and as little as could be expected to be present in such garbage. The city acted in good faith in the performance of its obligations under the contract, and used all reasonable efforts to keep the quantity of foreign matter at a minimum.

Upon various occasions during the operation of the plant, its manager complained to the members of the Board of Health of the city that the foreign substance was causing it trouble and annoyance, and that the machinery of the plant was being broken in consequence of its presence in the garbage. But neither he nor any officer or agent of the By-Products Company made any formal complaint, either written or oral, to the city authorities, until May 6th, 1910, when a letter was sent to the Board of Health making such complaint, and notifying it that on and after May 11th, 1910, the By-Products Company would cease operations and refuse to receive any more garbage. This course it pursued.

The city, upon receipt of this letter, to wit, on May 9th, wrote the Indemnity Company notifying it of the By-Products Company's threatened action, and forwarded a copy of the letter of May 6th. Upon the By-Products Company's suspension of operations and refusal to receive further garbage, another letter, dated May 11th, was written to the Indemnity Company by the attorney of the city advising it of that action, and that the city would look to it for indemnification for all damages suffered by it in the premises. On the same day the city's attorney also wrote to one Livingston, the president and general manager of the By-Products Company, notifying him that the city expected the Company to continue its contract, and that if it did not

resume work at once suit would be brought for breach of contract, and against the Indemnity Company on its bond. To this letter Livingston replied at length, charging the city therein with unfair treatment and violation of the contract.

Resumption by the By-Products Company not following, a temporary arrangement was made by the city for the disposition of the garbage. Under this arrangement it was disposed of from May 11th, 1910, to January 7th, 1911, at a cost of fifty cents per ton. At about the same time the city advertised for bids for the disposal of its garbage for a period of three, five, or twenty years. These bids were opened on June 1st, 1910, and the proposal of the American Extractor Company was ultimately accepted and the contract awarded to it September 26th, 1910. This company, however, failed to file the required bond, and forfeited its certified check for $1,000 deposited with its bid. Subsequently, to wit, on December 1st, 1910, the contract was awarded to one Fischer, whose bid for the reduction and disposal of the garbage was, in the judgment of the Board of Health, next best for the city's interests after that of the Extractor Company. This contract covered a period of ten years and was at the rate of $1 per ton. It contained a provision permitting the presence of ten per cent of foreign matter, and certain other provisions not contained in the Winton contract.

July 14th, 1910, the By-Products Company, with knowledge of the city's action, wrote a letter to the Board of Health stating that it was ready and willing to receive and dispose of the city's garbage in accordance with its contract, "provided you cause to be delivered to us garbage which *is* garbage as defined by its terms." The letter stated that notwithstanding the breaches of the contract by the city it regarded the contract as still in force, and that in case the city declined to carry it out

it would proceed to get redress at law. On July 29th, 1910, this was followed by another letter written by the By-Products Company's attorney and addressed to the city clerk, in which it gave notice that it was and had been at all times ready to receive all the garbage collected in the city, that its plant was then open and ready to receive such garbage, that it was ready to carry out all the terms of its contract, that the city was failing and refusing to deliver its garbage with the purpose of breaking its contract, and that, unless the city carried out the same and delivered all its garbage to the Company, the Company would hold the city for all damage it might thereby sustain.

The By-Products Company was not justified in rescinding its contract with the city on account of the presence of foreign matter in the garbage or otherwise, and broke its contract when, on May 11th, it suspended operations and refused to receive further garbage.

*Thomas M. Cullinan,* with whom was *William H. Comley, Jr.,* for the appellant (plaintiff).

*J. Birney Tuttle* and *Arthur M. Marsh,* for the appellee (the defendant and its receiver).

PRENTICE, C. J.  The receiver's primary objection to the allowance of the city's claim, or any part of it, is that at the time of his appointment on January 7th, 1911, there was no accrued liability arising under the bond which it gave to the city, since at that time the city had suffered no loss by reason of the By-Products Company's breach of its contract. This objection is not well founded. The By-Products Company's contract with the city was an entire and indivisible one. When that Company ceased operations and refused to receive further garbage, it committed a breach of that con-

tract. The breach was one of a dependent covenant going to the whole consideration, and therefore total. *Kauffman* v. *Raeder*, 47 C. C. A. 278, 286, 108 Fed. Rep. 171, 179; *Leopold* v. *Salkey*, 89 Ill. 412, 418. A cause of action in favor of the city thereupon arose for the recovery of the damages consequent upon such breach. It might have brought suit immediately, or waited such length of time as the statute of limitations permitted, but only one action could be brought, and in that action, whenever brought, full recovery, covering the future as well as the past, could be had. *Cohn* v. *Norton*, 57 Conn. 480, 490, 18 Atl. 595; *Stanton* v. *New York & Eastern R. Co.*, 59 Conn. 272, 283, 22 Atl. 300; *Pierce* v. *Tennessee Coal, I. & R. Co.*, 173 U. S. 1, 13, 19 Sup. Ct. 335; *Parker* v. *Russell*, 133 Mass. 74, 75; *Schell* v. *Plumb*, 55 N. Y. 592, 597; *Sutherland* v. *Wyer*, 67 Me. 64, 68; *Remelee* v. *Hall*, 31 Vt. 582, 585; 1 Sedgwick on Damages (9th Ed.) § 90; 1 Sutherland on Damages (4th Ed.) § 108.

The fact that it was uncertain and would, in the nature of the case, remain uncertain until the expiration of the period of the contract, what the amount of the damages resulting from the breach would prove to be, would not stand in the way of such full recovery, nor convert the city's claim as to the future into a contingent one. It would be unliquidated, but there is a wide difference between an unliquidated claim and a contingent one. A demand is none the less an accrued or matured one for being unliquidated. *Chemical National Bank* v. *Hartford Deposit Co.*, 161 U. S. 1, 10, 16 Sup. Ct. 439; *Hartford Deposit Co.* v. *Chemical National Bank*, 58 Ill. App. 256, 258.

Neither would it interfere with recovery that it could not be shown that damage had actually been suffered at the time suit was brought or the hearing had. If it was shown that it was reasonably certain that loss or

damage would result in the future, recovery could be had for that.

It makes no difference that the liquidation of the damages suffered by the city from the breach, in so far as the future was concerned, would be beset with difficulties. Those difficulties are the same in kind and no greater in degree than are frequently encountered in actions for personal injuries. *Pierce* v. *Tennessee Coal, I. & R. Co.*, 173 U. S. 1, 16, 19 Sup. Ct. 335; *In re Stern*, 54 C. C. A. 60, 63, 116 Fed. 604, 607; *East Tennessee, V. & G. R. Co.* v. *Staub*, 7 Lea (75 Tenn.) 397, 406. Uncertainties that may arise from an inability to forecast correctly what the future has in store for a plaintiff whose rights have been invaded by a breach of contract or a tort, do not suffice to convert his right of action into a contingent one, or to bar him from recovery as of a matured and accrued claim.

In the present case the city, months before a receiver was appointed, had an actionable, and therefore accrued, claim against the By-Products Company for the entire amount that it was damaged by reason of the breach of its contract. The Indemnity Company stands in the same position with respect to liability for the city's claim as did the By-Products Company. Its liability was a contingent one until the contract had been breached. The moment that the breach occurred its liability became a fixed and absolute one and, within the limits of the penal sum of the bond, was measured by that of the By-Products Company. *New York Security & Trust Co.* v. *Lombard Investment Co.*, 73 Fed. Rep. 537, 550; *Loeser* v. *Alexander*, 100 C. C. A. 89, 94, 176 Fed. Rep. 265, 270.

The receiver and his counsel refer to the following cases in support of their contention that the city's claim should be disallowed as unaccrued at the time of the former's appointment. *Attorney-General* v. *Equitable*

*Accident Ins. Asso.*, 175 Mass. 196, 55 N. E. 890; *Dean & Sons' Appeal*, 98 Pa. St. 101; *In re Equitable Reserve Fund Life Asso.*, 131 N. Y. 354, 30 N. E. 114; *People* v. *Commercial Alliance Life Ins. Co.*, 154 N. Y. 95, 47 N. E. 968; *People* v. *Metropolitan Surety Co.*, 205 N. Y. 135, 98 N. E. 412; *People* v. *Metropolitan Surety Co.*, 211 N. Y. 107, 105 N. E. 99.

No one of these cases is in point. In all of them it was held that the liability of the corporation against which the claim was filed, which was originally contingent, remained so, and did not become fixed until after the law's assumption of control of the affairs of the corporation in insolvency or receivership proceedings for the purpose of distributing its assets among its creditors. In the first four the claims presented arose out of insurance policies, fire or life, in which the obligation to pay was made dependent upon the contingency of loss by fire or death, and the contingency had not occurred when the court assumed jurisdiction. No one of the several claimants at that time had a right of action, and as a consequence it was held that they did not have provable claims.

In the fifth case, to wit, *People* v. *Metropolitan Surety Co.*, 205 N. Y. 135, 98 N. E. 412, the insolvent corporation in the receiver's hands was a surety company which had given its bond whereby it undertook to pay on demand to the plaintiff, in an action in which the defendant's property was attached, the amount of any judgment which might be recovered against him not exceeding a sum named. Thereupon, and before such judgment was rendered, a receiver of the surety company was appointed. Judgment having been rendered subsequently, a claim for its amount was presented to the receiver, and rejected by the court on the ground of its nonmaturity at the time the receiver was appointed. It was held that as the contingency, whose happening

would alone fix the liability, had not accrued prior to the receivership, there was no accrued claim.

The decision in the last case, to wit, *People* v. *Metropolitan Surety Co.*, 211 N. Y. 107, 105 N. E. 99, rested upon the same principle. A bare majority of the court, in opposition to a vigorous minority opinion, held that the liability under the building contract bond in that case was, by reason of its provisions, made contingent upon the rendition of a judgment against the contractor for his default, and that as such judgment had not been rendered prior to the receivership proceeding, the claim should be disallowed as not accrued. The minority strenuously contended that the only condition precedent to liability under the bond was a default by the contractor, which had occurred prior to the receivership, and that thereby the claim had become fixed and absolute. The controversy that thus divided the court is not explainable upon any other theory than that the decisive factor in the case was whether or not the contingency, whose occurrence fixed the liability, occurred before or after the receiver's appointment.

The present case differs from all those cited on behalf of the receiver, in the vital and controlling matter that the event, whose happening was, by the terms of the contract, to constitute a breach of it, and create a consequent liability for the resulting damage to the city, occurred some months prior to the receivership proceedings, and that the Indemnity Company's liability thereby became an accrued and absolute one, remaining to be liquidated only. It was therefore provable in the receivership proceedings. *Wells* v. *Hartford Manilla Co.*, 76 Conn. 27, 32, 55 Atl. 599; *Lothrop* v. *Reed*, 95 Mass. (13 Allen) 294, 298; *Chemical National Bank* v. *Hartford Deposit Co.*, 156 Ill. 522, 528, 41 N. E. 225.

Another claim made on behalf of the receiver is that the committee erred in finding, upon the subordinate

facts found by him, that the By-Products Company committed a breach of contract when, on May 11th, 1910, it ceased to operate, and refused to receive any more garbage. This claim is supported by the contention that the By-Products Company was justified in its then action by reason of the city's continuing conduct in delivering to it garbage which contained foreign matter, in violation, as it is said, of its duty under the contract. We fail to find in the contract, whether by express provision or fair implication from its terms, any undertaking on the part of the city to deliver garbage which should be free from foreign matter. By it the city undertook to collect and deliver at the By-Products Company's plant all the garbage and offal accumulated in the city which it legally could. For the purpose, doubtless, of indicating the scope of this undertaking, the contract included a statement of what was meant by "garbage and offal." In no other way could it be made to appear clearly what the city had agreed to do. The By-Products Company's undertaking, on the other hand, was to reduce the garbage and offal thus agreed to be delivered, or in certain contingencies to bury it. It does not appear that the city, either directly or inferentially, agreed to deliver the garbage free from foreign substances, or that the By-Products Company might decline to receive for reduction the garbage in case that it was not so free. The finding of the committee that it was practically impossible to collect the city's garbage without including with it some foreign matter, that the percentage of such matter in the garbage actually delivered was a reasonable amount to be found in any municipal garbage, and that it could not be expected that garbage delivered to a reducing plant by a city would contain less foreign matter than that which was delivered to the By-Products Company did contain, indicates what must have been the intention

of the parties when the contract was executed and the interpretation to be given to its terms, in the absence of express provision upon the subject to the contrary.

It is also urged that the committee erred in finding a breach by the By-Products Company in the face of its letter of July 14th, 1910, and its notice filed with the city clerk on July 29th, 1910. We have no occasion to inquire what these two communications disclose of the Company's then attitude in respect to its contract with the city, or what the city was reasonably entitled to infer therefrom that its attitude was. Whatever it was, and however willing it may then have been to carry out the contract according to its true intent and meaning, they came too late to nullify the unqualified breach of which the Company had been guilty more than two months prior, and to restore to life the contract so broken, and treated and acted upon by the city as broken and at an end by the Company's act, as it well knew. The city's cause of action for that breach had accrued, and the only possible bearing that a subsequent offer to perform could have, would be in the matter of the assessment of damages. *Gould* v. *Banks & Gould*, 8 Wend. (N. Y.) 562, 567.

It appears by the committee's report that frequently after 1907 all of the dead animals within the city were not delivered by it to the By-Products Company, so that its sales of hides were somewhat reduced. It does not appear that complaint was ever made of this failure until the letter notifying the city of the Company's intended suspension of service, or that the attention of the city authorities was ever called to it. In so far as appears it continued for about three years, and the city, if it was cognizant of the fact, might well have assumed that the omission was agreeable to the Company or at least that it waived its rights in that respect. The committee was justified in holding, as it did, that this mat-

ter did not furnish a sufficient excuse for the Company's rescission of the contract.

The receiver and his counsel further charge that the committee's finding that the damage to the city, by reason of the By-Products Company's breach of contract, was $20,786.09 was erroneous, since that amount, as they say or assume, was arrived at by multiplying the tonnage subsequent to January 7th, 1911, by fifty cents, the difference between the charge for reduction under the Fischer contract and that under the Winton contract. The trial court in its memorandum adopted this view, and apparently it furnished the chief reason which actuated it in rendering the judgment it did. It is quite true that such a method of computing the damages, unexplained, would appear to be without justification, since the undertaking of Fischer, for which the agreed payment was to be $1 per ton, was a different one and one apparently more favorable to the city in some respects than that of the By-Products Company under the Winton contract, which called for payment at the rate of fifty cents per ton. But we examine the committee's report in vain for foundation for the claim that the committee arrived at the amount of damages by any such method. It may be quite true that it did; but the record does not so inform us, and the court below, whose source of information was confined to the committee's report, was equally without that information. The report states that the damages were $20,786.09, and there stops. It is altogether silent as to the method employed by the committee in reaching this conclusion and as to the evidence bearing upon the assessment of damages that was before him. Not only is this the situation, but there is in the report an entire absence of facts from which a deduction as to the committee's method of computation could by possibility be made.

Counsel for the receiver, in their brief, say that the only effort which the city made to furnish the court with information with which to measure the damages recoverable, was by the introduction of the Fischer contract. The record contains no information to that effect. We fear that the court below was misled by statements made in its presence, or otherwise, into the belief that the report contained more than it does. Containing, as the report does, only the ultimate conclusion that the damages amounted to the sum named, it cannot be said that the court erred in reaching it.

If the receiver was of the opinion that the committee had erred, as the brief filed on his behalf states, or otherwise, either in adopting a wrong rule for the measurement of damages or in erroneously applying the right rule, he should have remonstrated against the acceptance of the report and asked for its recommitment for its amplification, so that it would show what rule the committee did adopt and how he proceeded in applying it.

There is error, the judgment is set aside and the cause remanded to be proceeded with according to law.

In this opinion the other judges concurred.