## THE CITY OF BRIDGEPORT vs. THE AETNA INDEMNITY COMPANY.

First Judicial District, Hartford, January Term, 1919.
PRENTICE, C. J., RORABACK, WHEELER, BEACH and GAGER, Js.

A garbage-reduction plant which has refused to carry out its contract with a city, cannot expect the municipality to overlook its own interests in making a new contract with another company; the city is only bound to take such action as it can, reasonably and with due regard for its own welfare, to minimize the damages resulting to it from the other party's breach.

In the present case the city, after receiving competitive bids, entered into a new contract for a ten-year period, with another reduction plant, and thereby decreased the cost of the reduction and disposal of the garbage by at least $1 a ton, and at the same time obtained some additional terms more favorable to the city then those in the contract which was broken. *Held:—*

1. That in so doing the city acted fairly and reasonably and with due regard to its obligation to keep down the damages.

2. That in determining the extent of the city's damages, the trier was justified in taking notice of the second agreement and in using it as a factor in so far as it was helpful, making due allowance or reduction, however, for the minor, incidental variations or modifications which were more favorable to the city.

3. That the refusal of the trial court to make a greater deduction than fifteen cents a ton from the new rate, was not an unreasonable conclusion or decision upon the subordinate facts found.

A contractor cannot complain of the presence of five per cent of foreign matter in the garbage delivered to him for reduction, although there is no specification in the contract relating to that matter.

Observance of the sanitary regulations of the health authorities is incumbent upon a garbage-reduction contractor, who must also conduct his business in such a manner as not to create a nusiance; and it is immaterial whether the contract so provides or is silent respecting these matters.

A conditional offer to resume work under its contract, after an unqualified breach, does not obliterate the breach or revive the original agreement.

Argued January 7th—decided February 19th, 1919.

INTERVENING APPLICATION in receivership proceedings, by the plaintiff, an alleged creditor of the defend-

ant, praying for an allowance of its claim, brought to the Superior Court in Hartford County and referred to a committee who found and reported the facts; the court, *Curtis, J.,* overruled a remonstrance to the supplementary report of the committee and rendered judgment allowing the plaintiff's claim in the amount of $10,000, and from this judgment the receiver of the defendant appealed. *No error.*

The situation with which this proceeding is concerned is for the most part fully set out in *Bridgeport* v. *Aetna Indemnity Co.,* 91 Conn. 197, 99 Atl. 566. Upon the remand of the cause at that time, it was recommitted to the committee for hearing, finding and report as to the damages sustained by the city by reason of the By-Products Company's default complained of and found. The supplemental finding shows the following facts in addition, for the most part, to those covered by the resumé contained in volume 91:—

In May, 1910, following the defendant's breach of its contract, the city, by public advertisement, invited bids for the disposal of the garbage and dead animals collected by the city for each of four periods, to wit, three, five, ten, and twenty years. Among the bids received, four in number, was one by Charles G. Fischer, who offered to perform the work for ten years for the price of $1 per ton. This, the second lowest offer, was finally accepted, after the failure of the lowest bidder to file the required bond, and a contract was entered into in accordance with its terms.

This contract called for the performance of the same service as did the so-called Winton contract, which had been broken by the By-Products Company, and was in all material respects similar to that contract save as respects the time covered by it and the incorporation into it of the following four clauses:—

"(a) It is understood however by the party of the

first part (Fischer) that the garbage and offal cannot be delivered wholly free from foreign articles or substances, and it is agreed by said party of the first part that the quality or character of the garbage and offal now being collected in said city shall be a fair standard of the garbage and offal to be delivered under this contract, subject to the changing conditions of the different seasons, provided however, that if at any time it is found that the garbage delivered at said plant shall contain more than ten per cent (10%) of foreign or extraneous matter, written notice thereof shall be given to the Board of Health of said City, and said Board shall, within a reasonable time thereafter, deliver or cause to be delivered at said plant garbage containing not more than ten per cent (10%) of foreign or extraneous matter.

"(b)   The said Fischer agrees that his said plant and the process, methods and systems to be employed by him at his said plant for the reception, handling, reduction and disposal of said garbage, offal and dead animals shall not cause or create any nuisance or offensive odors, and that, subject to paragraph 7 below, said plant shall be at all time in suitable condition to receive and expeditiously reduce and dispose of all material, delivered in accordance with the terms of this contract; that said premises will be kept throughout in a sanitary manner, as aforesaid, subject to all reasonable regulations of said Board of Health.   Said Fischer further agrees that he will not cause any offensive odors by the fluids that may be carried from said plant to any stream of water.   The provisions of this paragraph are declared to be of the essence of this contract, and said City, for any substantial breach thereof, or any other substantial violation of this agreement by said Fischer, shall have the right to annul this contract, provided however, that the odor of raw garbage, offal and dead

animals within a distance of three hundred yards from said plant shall not be considered a violation of the provisions of this contract.

"(c) Said Fischer agrees that the slaughter house now standing on said location may be used, owned and enjoyed by said City during the period of this contract on the same terms as the original lease thereof from the Bridgeport By-Products Company to said City, and also the land described in said lease, but it is stipulated that said ownership and use by the City shall be made by the parties hereto subject and subordinate to any mortgage which said Fischer shall see fit to place upon said land, and the said Fischer agrees to lease to said City for said period, and on the same terms, additional land adjoining the land now used by and leased to said City, under said lease, so that the area of land to be leased to and used by said City shall be not less than 1600 square feet; and the said Fischer agrees that the said City shall have the privilege of connecting said slaughter house with the sewer which drains said plant and maintaining such connection without costs, rent or expense to said City other than the cost of making such connection. Said use and occupation of said slaughter house shall be subject to revocation by said Fischer if the same shall not be conducted in a sanitary and inoffensive manner or if all the waste products except blood therefrom shall not be delivered into his plant.

"(d) Said Fischer agrees that his said plant shall have at said commencement of operation a capacity to properly dispose of at least fifty (50) tons of said garbage per day, and that he will increase the same from time to time to the extent necessary to dispose, day by day, of the daily accumulations and deliveries of the same, and that he will day by day, dispose of the daily accumulations and deliveries."

In making his bid Fischer was unaware that either of the four stipulations above recited would be contained in the contract he would be called upon to sign. He, however, did expect that requirements in some form would be included with reference to his receiving without complaint more than five per cent of foreign material in the garbage, and that much strictness would be required in preventing the existence of odors in residential districts near the plant. He believed, on account of the system which he employed and his successful use of it elsewhere, that he would have no difficulty in preventing odors should the contract be awarded to him, and he knew the average run of foreign material in the Bridgeport garbage which he believed that he could remove without damage to his machinery.

A plant erected to reduce twenty-five tons of garbage per day is adapted to the reduction of from thirty-five to fifty tons per day by the use of more fuel and its operation longer hours.

Fischer's knowledge of the probability that great strictness would be required in the operation of his plant to secure the elimination of odors, and that there was a considerable amount of foreign matter in the garbage, did not have any material effect upon the price of his bid.

The four inserted provisions enumerated did not, in Fischer's judgment, impose upon him additional burdens which should cause him to change his original bid, for the reason that he was aware of the poor condition of the plant which the By-Products Company had been operating, and felt confident that owing to the superiority of his system of reduction and his experience with it elsewhere, he would be able to satisfy the demands of the Bridgeport authorities in respect to the matters covered by the addtional provisions.

The lowest price at which the city could have pro-

cured the reduction of its garbage under the terms of the Winton contract for the balance of the term thereof would have been $2 per ton. The cost of removing five per cent of foreign matter would amount to from 15 to 20 cents a ton. The amount of garbage reduced from January 7th, 1911, to May 29th, 1914, was 41,572.38 tons.

The city suffered substantial damages by the By-Products Company's default, amounting to at least 35 cents per ton of garbage reduced, or $14,550.33 in the whole. The burial of the city's garbage, which course had been pursued following the By-Products Company's default down to January 7th, 1911, when the Fischer contract went into effect, would have been neither sanitary nor feasible to continue during the remainder of the Winton term.

*Arthur M. Marsh*, for the appellant (receiver of the defendant).

*Thomas M. Cullinan*, for the appellee (plaintiff).

PRENTICE, C. J.   All of the reasons of appeal relate to the action of the court below in accepting, against remonstrance, the report of its committee to whom was referred the duty of hearing the evidence touching the extent to which the city had been damaged by reason of the By-Products Company's breach of its contract, and of reporting its conclusions thereon. The complaints, made in somewhat varying forms, are, in substance, that the committee acted improperly and harmfully to the Indemnity Company in using in any way the Fischer contract as a factor or guide in the determination of the extent to which the city had been damaged, and that the manner of its use by the committee amounted to a misuse of it.

The Indemnity Company's obligation as surety on the bond guaranteeing the By-Products Company's faithful performance of its contract is measured by the loss, up to $10,000, which the city suffered from the By-Products Company's failure in performance. When the breach occurred by the By-Products Company's cessation of service, the ten-year contract had four years to run. The lowest price at which the city could have procured the reduction and disposition of its garbage and dead animals, as undertaken by the By-Products Company under its contract commonly known as the Winton contract, for a four-year period would have been $2 a ton. Under the circumstances it was the city's moral and legal duty to take such action as it could, reasonably and with due regard for its own interests, to the end that the damage to it resulting from the breach might be kept down to the minimum. *Hamilton* v. *McPherson*, 28 N. Y. 72, 76; 13 Cyc. 72.

Acting in conformity with the duty thus resting upon it, the city, immediately following the breach, advertised for bids for the disposal of its garbage for varying periods. As the ultimate result a contract was entered into, upon the best available bid, with one Fischer for a ten-year period beginning January 7th, 1911, and at a price of $1 per ton. Under this contract the city's garbage and dead animals were disposed of until the expiration of the time period of the Winton contract and afterward. The Fischer contract called for the performance of the same service as did the Winton and by the same method, to wit, reduction, and was similar to the latter contract in all material particulars save for the incorporation of four additional provisions.

When the contract was entered into with Fischer, the city was faced by certain conditions. Its duty was to minimize as far as it reasonably could its loss by reason of the By-Products Company's breach. It

could not secure a contract limited to the remaining period of the Winton contract which would not entail a heavy and inordinate burden of loss. It could not contract for a more extended period than the balance of the Winton period, upon the Winton terms unchanged, without imposing upon itself for the whole period of the new contract what it might regard as burdensome conditions contained in the Winton contract, and at the same time depriving itself of desired provisions. It was placed in the position where it was impossible for it to reduce its loss below one of $1.50 a ton and at the same time retain its freedom to contract for the time beyond the expiration of the Winton term as should meet its wishes. If the Winton contract was not altogether satisfactory, as apparently it was not, the city was driven to one of three alternative courses. It could either enter into a contract for the remaining years of the Winton term, in which case the resulting damage would remain at an inordinately high figure, or it could execute one for a longer period containing such modification as it desired for its protection in the years to come after the Winton contract had run its ten-year course, or it could, unmindful of its own interests, contract for a long period upon the Winton terms.

The second of these courses was pursued, with the result that the cost of reduction and disposal was reduced one half and the desired protection of the city's interest at the same time secured. As the new contract was obtained after open and public competition and upon what were apparently the best available terms, and the loss to the city resulting from the breach of the Winton contract was thereby reduced at least from $1.50 to 50 cents a ton while at the same time the modifications made in the new contract were only minor ones affording the city desired protection in its execution after May 27th, 1914, there would seem to be

slight ground indeed for a claim that the city had not acted fairly and reasonably in the matter and had not performed its full duty of taking reasonable action to minimize its loss from the By-Products Company's breach. It was under no obligation to enter into a long term of contract for the defaulting company's protection entirely regardless of the former's interest covering the years which would follow the termination of the contract broken. Its duty to the defaulting company was to do what was reasonable under the circumstances, that the damages suffered by it might be kept down, and that only. It was under no obligation to do its utmost to that end without regard to its own interests, thereby exalting the company's interests above its own. The test of reasonableness was one which had a broader outlook and took into account all the circumstances of the situation.

These considerations effectually dispose of the receiver's contention that the Indemnity Company was discharged and released from liability upon its bond, in excess of nominal damages, by the execution of the Fischer contract. The fact that the By-Products Company, by its letter of July 14th, 1910, and before the Fischer contract was executed, made the conditional offer it did to resume work under its contract, does not change the situation. *Bridgeport* v. *Aetna Indemnity Co.*, 91 Conn. 197, 209, 99 Atl. 566.

As the Fischer contract was one which the city might reasonably have entered into, and for aught that appears was entered into fairly and upon the best available terms, it follows that the committee was fully justified in taking cognizance of it and using it as a factor in its determination of the extent of the damages the city suffered by reason of the By-Products Comany's breach of its contract, and as a guide in such determination in so far as it might be helpful. Had it

conformed in all respects to the Winton contract, excepting in the matters of dates and price, no exception could be taken to its use as fixing definitely and precisely the extent of the city's damage. Its four additional paragraphs, apparently embodying provisions favorable to the city, forbid such use to be made of it, at least without further inquiry. Their presence does not, however, forbid its use as a basis of computation, if so be it furnishes a reasonable and helpful one. That it does furnish such basis is clear. The two contracts require of the contractor the doing of the same service and by the same method. The main provisions of the two are alike in all material respects. The variations from the Winton contract embodied in the four additional provisions of the Fischer contract are so far minor and incidental, and so far susceptible of separable consideration and estimate, that appraisal with reasonable accuracy of the additional burden imposed by them upon the contractor presents a by no means difficult problem. Due deductions from the price fixed in the Fischer contract being made for any increased cost by reason of these variations, a result will be arrived at which will approximate more nearly to the precise than would any other method which the circumstances suggest as available. Precision and certainty are not required. *Satchwell* v. *Williams,* 40 Conn. 371, 374.

Counsel for the receiver is, of course, quite right in saying that the city is not entitled to obtain, under the guise of the allowance of a claim, reimbursement for what it had expended for a better or variant service. But that is precisely what is not done by the use of the Fischer contract as the basis of determination, with proper allowances made for modifications of the terms of the Winton contract appearing in the former.

This was the course the committee pursued. It took

the price per ton which the city was required to pay under the Fischer contract, and made such deductions therefrom as it found was reasonable on account of the incorporation of the four provisions referred to, and found that 85 cents a ton represented the cost to the city of obtaining the service which the Winton contract required the contractor to render, and under the same incidental conditions which the Winton contract imposed.

It remains to inquire whether the committee, in its employment of that method and its application of it to the circumstances of the case as found, erred. As bearing upon this inquiry it is to be remembered that the questions here at issue are those of fact pure and simple. The conclusions of the committee must, therefore, stand, unless they are such as could not reasonably have been arrived at upon the subordinate facts found.

The first of the additional provisions required the contractor to accept from the city garbage containing as high as ten per cent of foreign and extraneous matter, whereas the Winton contract made no specifications upon that subject. At the time of the former appearance of this case before us we held that notwithstanding the absence of such specification from the Winton contract, the contractor could not complain of the presence of five per cent of foreign matter in the garbage delivered to it, and was in duty bound under its contract to reduce garbage containing that quantity of foreign matter. *Bridgeport* v. *Aetna Indemnity Co.*, 91 Conn. 197, 208, 99 Atl. 566. The committee has found that the cost of the removal of an additional five per cent of foreign matter, if it were present, would amount to from 15 to 20 cents a ton.

The second, in the order of enumeration of the additional clauses, imposed upon Fischer little, if any, restraint to his freedom of action, or burden of any sort

from which the By-Products Company under the Winton contract was free. Whether the agreement under which a contractor is operating in the reduction of garbage speaks upon the subject or is silent, he is subject to the reasonable regulations of health authorities and is under the duty to observe the sanitary regulation of such authorities, and to conduct his business in such manner as not to create a nuisance.

The remaining additional clauses relate to matters which, in view of the committee's finding that a plant erected for the reduction of twenty-five tons of garbage a day is adapted for the reduction of from thirty-five to fifty tons a day by the use of more coal and its operation for longer hours, are manifestly of comparatively small importance as bearing upon the cost per ton of reduction.

Whether this last statement be true or not, the finding of the committee that Fischer's bid was made without reference to either of the four conditions enumerated, and without knowledge that either of them would be incorporated into the contract when executed, that the contract with him was made in accordance with that bid, that Fischer, in the execution of his contract, did not regard either of them as imposing upon him an extra burden justifying him in asking a figure in excess of that named in his bid, and that he executed a contract which recognized no such additional imposition, suffice to render the court's refusal to make a greater reduction from the $1 rate, at which the service was undertaken and performed by Fischer, than that of 15 cents, on account of anything contained in the four provisions first appearing in his contract, one which cannot be pronounced unreasonable.

There is no error.

In this opinion the other judges concurred.