SALVATORE MAZZOTTA *vs*. MAX BORNSTEIN ET ALS.

First Judicial District, Hartford, March Term, 1926.

WHEELER, C. J., CURTIS, MALTBIE, HAINES and HINMAN, Js.

In his action to foreclose a mechanic's lien for labor and materials furnished in the construction of the defendants' factory building, the plaintiff incorporated in his bill of particulars, admitted by the defendants, an item of $300 "for installing electric elevator in place of hydraulic," and subsequently filed an amendment in which he claimed an additional $300 as the cost of making a change from one type of electric elevator to another. *Held* that the plaintiff was entitled to no more than the amount admitted by the defendants to be due, since it appeared that the negotiations with respect to the change in the

Mazzotta *v.* Bornstein.

kind of elevator specified in the original plans were too indefinite to effect an alteration of the contract.

The construction and interpretation of the plans and specifications annexed to a building contract, present a question of law which is reviewable by this court.

The plans and specifications in the present case reviewed and *held* not to require the plaintiff to use cast iron instead of tile pipe in the construction of certain rain-water drains.

In an action by one party to a contract to recover damages for a breach by the other of a provision for performance within a given time, it is immaterial whether or not time was of the essence, for that question is of importance only in determining whether exact compliance with the provision is a condition precedent to the right of the party obligated thereby to insist upon performance by the other.

The plaintiff was in no position to claim that his failure to complete the building within the stipulated time was attributable to a change in the specifications as to the kind of lumber to be used, since it appeared that the change was made before the provision in question was inserted in the contract; nor was there merit to his contention that the rejection by the parties of a proposal for a bonus in case the building was finished sooner than provided and for a forfeiture in case it was not, indicated an intent that he should not be liable in damages for delay in its completion.

The contract provided for the construction of the building within "eighty working days." *Held* that this phrase, having no settled meaning as used in building contracts, was properly construed by the trial court to effectuate the intent of the parties which, as disclosed by the surrounding circumstances, was to exclude Sundays, holidays and rainy days, but not cold days.

The trial court overruled the plaintiff's claim that his inability to finish the work on time was due to the failure of the defendants seasonably to notify him of certain structural alterations ordered by the building department of Middletown, and concluded that the responsibility for the delay rested chiefly with the wholesale lumber dealer from whom the plaintiff ordered the timbers necessary to meet the requirements of the municipal authorities. *Held* that the trial court's conclusion was reasonable; and that the plaintiff's claim, even if true in fact, was legally insufficient in view of his failure to comply with the contract provision to the effect that no extension of time would be allowed him because of any act, neglect or fault of the defendants, "unless a claim therefor is presented in writing to the supervising architects within forty-eight hours of the occurrence of such delay."

Mazzotta *v.* Bornstein.

An owner who avails himself of the usual provision in building contracts, authorizing him, after the neglect or refusal of the contractor to supply a sufficiency of materials, to furnish them himself upon certificate of the architect and notice to the contractor, is in the position of an injured party endeavoring to minimize the damage flowing from a breach of his legal rights, and his action in this respect is not inconsistent with a subsequent claim for damages for delay in the completion of the work resulting from such neglect or refusal on the part of the contractor.

Ordinarily the measure of damages for delay in the construction of a building is its rental value for the period of that delay; but where, as in the present case, the owner, to the knowledge of the contractor, is constructing the building for the purpose of moving his business thereto from rented premises, the rentals which he is thus obliged to pay during the period of the delay, less any savings of expense in the operation of his business that is shown to have resulted from his continued occupation of such premises, constitute the real injury which he suffers as a direct consequence of the contractor's default and afford the proper measure of his damages.

In the present case, the difference in the cost of labor at the location of the rented premises and at the *situs* of the new building, could not fairly be said to have been within the contemplation of the parties and, therefore, was not a recoverable item of damage.

Where payments to the contractor are retarded because of his delay in the prosecution and completion of the work, he is not entitled to offset against the owner's claim for damages, interest upon the sums so withheld, at least where it does not appear that the owner profited from the situation.

The obligation of an injured party to minimize his damages is measured by the standard of reasonable conduct.

Argued March 2d—decided May 29th, 1926.

ACTION by a building contractor to foreclose a mechanic's lien, in which the defendants filed a counterclaim to recover damages alleged to have been caused by the plaintiff's breach of contract, brought to the Superior Court in Middlesex County and tried to the court (*Banks, J.*) which found that there was due the plaintiff under the contract $17,248, and that the defendants were entitled to recover $3,361 upon their

counterclaim, and rendered judgment for the plaintiff for the difference between these sums, from which the plaintiff and the defendants appealed. *Error in part on plaintiff's appeal and judgment corrected; no error on defendant's appeal.*

*Francis W. Cole,* with whom was *Barclay Robinson,* for the appellant (plaintiff).

*Ernest A. Inglis,* for the appellants (defendants).

MALTBIE, J.   The plaintiff is seeking the foreclosure of a mechanic's lien filed by him to secure a balance he claims under a contract for the construction of a two-story factory building for the defendants.   The trial court, in determining the amount due, refused to include a charge in addition to the contract price, made by the plaintiff by reason of a change in the kind of elevator to be installed; and it made certain deductions on account of damages suffered by the defendants through the plaintiff's alleged failure fully to perform his contractual obligations.   Both parties have appealed, claiming errors in the rulings of the trial court in regard to these items.

During the progress of the work, the defendants decided that they would prefer to have installed an electric elevator in place of the hydraulic elevator specified, and the plaintiff agreed to install one of "the best type," with a capacity of two tons, at an additional cost of $300, and received from the defendants a written order to do so.   The plaintiff thereafter submitted to defendants' architect specifications for a chain driven two-ton electric elevator which he refused to approve. After some discussion as to the type of elevator referred to in the order, the defendants notified the plaintiff to install a direct connection one-ton electric eleva-

tor, stating that there had been a misunderstanding as to the matter and that, as the cost of the one-ton elevator was not more than that of the hydraulic elevator specified in the contract, there would be no change in the contract price on account of the substitution. The plaintiff installed a one-ton direct connection elevator, and notified the defendants that he would expect to be paid the difference between the cost to him of that elevator and the amount he would have had to pay for a two-ton chain driven electric elevator, that is, $300. In the original bill of particulars of "extras" filed by the plaintiff he included an item as follows: "For installing electric elevator in place of hydraulic elevator, $300"; and the defendants in their answer admitted the correctness of this bill of particulars. Later he filed an amendment seeking to recover an additional sum of $300 on account of the change in the kind of elevator installed. Plaintiff's agreement to install a two-ton electric elevator of "the best type," and the defendants' order to him to install an electric elevator without specifying the type or capacity, were, in view of the evident diversity in the way in which such elevators are constructed, too indefinite to impose any obligation upon the plaintiff. They furnish no basis for the plaintiff's claim that the later notice from the defendants and the plaintiff's compliance with it, superimposed one agreed alteration of the contract upon another. The plaintiff might have regarded that notice as a distinct and separate direction for an alteration of the contract. But by inserting in his bill of particulars the item of $300 for installing the electric elevator, he chose to regard that notice as supplementing and making definite the earlier attempted agreement and order, and the defendants, by admitting the correctness of the item, have assented to that construction of the situation. There is no

ground for the recovery by the plaintiff of any additional sums.

The trial court made an allowance to the defendants because the plaintiff used tile instead of cast iron pipe for certain drains under the floor of the building to carry off the water from the rain conductors leading from the roof. Depending, as it does, solely upon the construction of the plans and specifications for the building, the question presented is one of law, reviewable by us. *Quinby Co.* v. *Sheffield,* 84 Conn. 177, 188, 79 Atl. 179. Neither the plans nor the specifications expressly designated the materials of which these drains were to be made. The latter, under the heading "Mason Work," required a line of tile drain from the street sewer to the building for the soil pipe and conductor drains, "to be 6″ for the main line and 5″ for the branches"; and under the head of "Plumbing," they contained the following: "There will be a complete plumbing system installed to conform to the local and state ordinances and rules. Run a line of cast iron ex. heavy pipe from 5′ outside of building in and up to 2′ above the roof." The main portion of the building was rectangular, but on one side a short wing jutted out, in which were to be the toilets and the boiler-room. The plans of the main building throw little, if any, light upon the particular issue being considered, but the detail drawings of the wing are illuminating. They show that the six-inch drain from the street sewer was to run nearly to its outer wall; that it was to continue into the area of the wing as a five-inch drain, the material not being specified; that about six feet inside the outer wall, the drain divided, one branch, marked as a four-inch cast iron pipe, running to the toilets, and the other continuing on beyond the wall or the wing, marked where the lines of the drawing cease, "5″ tile"; and that into this latter branch

ran the conductor which drained the roof of the toilet and boiler-rooms. A consideration of this portion of the plans makes certain the fact, suggested in the very terms of the specification, that the requirement of a cast iron pipe under the head of "plumbing" referred to the soil and vent pipe connected with the toilets, not to the drains from the rain-water conductors. So a comparison of these drawings with the specifications under the heading "Mason Work," discloses quite as convincingly an intent that the drains from the rain-water conductors in the main building were to be of tile; the provision in the specifications as to the "branches" from the main drain would otherwise be meaningless; the rain-water conductor from the roof of the wing ran into a drain beneath the floor of the boiler-room clearly designated as tile; the extension of this drain beyond the wing could only, under the plans, be intended to illustrate the connection to be made with the other rain-water conductors; and here, the only place on the plans where the underground drains appear at all, the material of which they were to be constructed was designated as tile. The trial court was in error in construing the plans and specifications as requiring that these drains be constructed of cast iron.

The largest item in dispute is a deduction made by the trial court because of the failure of the plaintiff to complete the work within the time fixed by the contract. The contract contained this provision: "The contractor shall complete the several portions, and the whole of the work comprehended in this agreement before the expiration of the eighty working days commencing with and next succeeding the fifth day of November, 1923." The plaintiff contends that this provision was not of the essence of the contract and hence his failure to comply with it did not entitle the defend-

ants to any damages they may have suffered. It is not necessary to decide whether, accurately speaking, the time of performance fixed was of the essence of the contract, for whether it was so or not, the defendants, in the absence of circumstances of excuse or waiver, are entitled to recover any damages they have suffered by reason of the plaintiff's breach of his undertaking in this regard. "When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party. It does not mean that delay will not give rise to a right of action against him. A breach of any promise in a contract, whether of vital importance or not, will do that; nor does the phrase mean merely that time is a material matter, but that it is so material that exact compliance with the terms of the contract in this respect is essential to the right to require counter performance." 2 Williston on Contracts, § 846; and see *C. W. Hunt Co. v. Boston Elevated Ry. Co.*, 199 Mass. 220, 233, 85 N. E. 446; *Deeves & Son* v. *Manhattan Life Ins. Co.*, 195 N. Y. 324, 330, 88 N. E. 395; 9 Corpus Juris, 790.

There is nothing in the facts found which could offset the formal undertaking of the plaintiff to complete the contract in eighty working days. Nor can the additional findings which he seeks avail him. Thus, he requests a finding that, during the negotiations leading up to the contract, a change was made from the Georgia pine, first specified for the heavy timbers, to Douglass fir, and that it was then explained to the defendants that the fir would have to come from the Pacific coast and would probably take three months to arrive. The significance of this finding for present purposes would lie in its concluding clause, and the only

evidence to support that is the testimony of the plaintiff himself. These timbers were to be used, according to the specifications, for the second floor beams and columns and the roof trusses and purlins, and so would not be needed until the work was well along, so that the plaintiff would have a substantial portion of the whole period allowed for the construction in which to receive them. In the light of that situation, over against his spoken testimony, must be placed the fact that, with knowledge of the long distance the timbers must be brought and after considerable negotiation, he finally agreed to complete the contract in eighty working days. The trial court might well have preferred the very strong inferences arising from these circumstances to his spoken testimony. The plaintiff also requests an additional finding that during the negotiations preliminary to their agreement, the parties discussed and rejected a provision for a bonus, should the building be completed before the time fixed, and a forfeiture, if it should not. But it does not at all follow from an unwillingness to agree upon such a provision that the parties did not intend that the plaintiff would be liable for legal damages should he fail to perform within the time fixed; a consideration which is emphasized by the indication in the testimony cited by the plaintiff that the failure to agree was really due to the defendants' objection to the inclusion of a bonus to offset the provision for a forfeiture they desired.

The failure of the plaintiff to complete the work within the time specified would constitute a breach of his contract. But both parties claim that the trial court erred in its conclusions as to the length of the delay for which the plaintiff should be held liable. The trial court construed the phrase "eighty working days" as including all days except Sundays, holidays and rainy days, and this was correct. It is quite pos-

sible that the phrase "working days" has a settled
meaning which might not lightly be put aside when it
is used in certain connections, notably in charter par-
ties, but we know of no customary significance which
attaches to it in the general law of contracts, or, spe-
cifically, when it is used in building contracts. Cer-
tainly it has no meaning so fixed that a court, reading
the contract in the light of its subject-matter and the
surrounding circumstances, may not give to the phrase
such a reasonable construction as will fairly effectuate
the intent of the parties. *Mullen* v. *Reed,* 64 Conn.
240, 247, 29 Atl. 478; *In re Curtis-Castle Arbitration,*
64 Conn. 501, 513, 30 Atl. 769; *Seery* v. *Waterbury,* 82
Conn. 567, 569, 74 Atl. 908. The trial court finds that
during the negotiations leading up to the making of
the agreement, the plaintiff agreed to the insertion of
the provision requiring the work to be completed in
eighty working days upon the express understanding
that the phrase should not include rainy days. This
understanding of the parties was properly considered
by the trial court, not for the purpose of ascertaining
any unexpressed intent, but in order to determine the
intent they meant to express by the phrase they used.
*In re Curtis-Castle Arbitration, supra; Murphy* v.
*Schwaner,* 84 Conn. 420, 428, 80 Atl. 295. In the light
of this understanding there is no room to doubt that
the phrase "working days" was not intended to include
days when the performance of work was prevented by
storms. On the other hand, especially in view of the
court's finding that the work might be carried on in
cold weather, though requiring some additional pre-
cautions, the trial court was correct in not excluding
cold days.

The trial court, in determining the length of the de-
lay for which the plaintiff was liable, made an allow-
ance of three weeks because of a change in the contract

by which steel trusses were substituted for wooden ones, and this allowance is not questioned on the appeal. The plaintiff does claim, however, that a further allowance should have been made on the ground that the delay was attributable in part at least to an increase in the size of the heavy timbers to be used for floor beams and roof trusses, which came as a result of a notice from the municipal building department that the dimensions specified were not large enough. The contract was signed November 3d, 1923, and the notice from the department was given within a week thereafter, but it was not until November 26th that the defendants gave the plaintiff written instructions, in accordance with the terms of the contract, specifying the larger sizes to be used. The plaintiff immediately thereafter placed his order for the lumber with a local lumber dealer in Middletown, who in turn ordered it from a wholesale dealer. Because of the latter's delay, the lumber had not arrived by the end of February, 1924, and it was then somewhat uncertain when it would arrive. Acting under the provisions of the contract entitling them to do so, the defendants themselves ordered the timbers, and they arrived about March 20th, 1924. The trial court finds that the delay incident to securing the lumber was one of the chief causes of delay in the construction of the building, but that the defendants' delay in ordering the change in the size of the timbers did not delay the work. The plaintiff seeks an additional finding in this connection to the effect that the larger timbers were more difficult to obtain than those first specified, but the evidence he cites, while showing that they would be more expensive, fails to show that they would be more difficult to obtain. How long it was after the defendants themselves took steps to secure timbers for use in the building that those ordered by the plaintiff arrived, does not

appear, and, on the other hand, it would be a fair inference that it was not until after the arrival of those purchased by the defendants, which came on March 20th. Certainly we cannot say that, had the defendants ordered timbers of the larger sizes immediately upon receiving the notice from the building department, they would have arrived in time to prevent the defendants from themselves procuring timber elsewhere and, lacking that element, the delay of the defendants in ordering the larger timbers could not be said to have hindered the completion of the building; an act or omission can hardly be regarded as the cause of an event which would have happened had the act or omission not occurred. Moreover, the trial court finds that the failure of the timber to arrive by the end of February was "by reason of the delay of the wholesale dealer" through whom it was ordered, and his delay and not that of the defendants may have seemed to the trial court to have been the real cause of the delay in the completion of the building. We cannot hold unreasonable or illogical the conclusion of the trial court. But even if that were not so, the plaintiff is in no position to claim an extension of time on this account. The contract provided that if the plaintiff was delayed in the prosecution or completion of the work by any act, neglect or default of the defendants, the time set for completing the work would be extended for an equivalent period, to be determined by the architect, "but no such allowance shall be made unless a claim therefor is presented in writing to the supervising architects within forty-eight hours of the occurrence of such delay." The plaintiff made no such claim for the delay we are considering, nor did the architect ever determine how long a time should be allowed.

The plaintiff claims that, as the defendants ordered

various changes and extras in the course of the construction and permitted him to continue his work after it became apparent that he could not complete the contract within the time fixed, they must be deemed to have waived any claim for damages for delay. This claim is disposed of by the finding of the trial court that none of the changes and extras, except as regards the substitution of the steel trusses, delayed the progress of the work. The contract provided, moreover, in the clause just referred to, the course which the plaintiff should have taken had he been delayed by them, that is, an extension of time within which to perform, claimed by him in writing and fixed by the architect; and this course the plaintiff did not follow. The plaintiff further contends that the defendants waived any claim for delay growing out of the failure of the heavy timbers to arrive because they themselves finally furnished the lumber at an increased cost, which the plaintiff allowed to them upon the contract price. The contract contains the clause, usual in building contracts, which provides, among other things, that if the contractor refuses or neglects to supply a sufficiency of materials, the owner, upon certificate of the architect and after notice to the contractor, may supply them. Action under this clause presents a different situation than that before this court in *New Haven* v. *National Steam Economizer Co.*, 79 Conn. 482, 65 Atl. 959, where the owner, upon default of the contractor, took over the entire conduct of the work. Here all the defendants did was to provide the plaintiff with certain materials necessary in his conduct of the work. The defendants' position is rather that of an injured party who takes advantage of an opportunity to minimize the damages which he would otherwise suffer from a breach of his rights. There is no inconsistency between the defendants' conduct in furnishing the

timbers and receiving credit for them and their present claim for damages for the delay in completing the work.

Both parties claim that the trial court erred in the amount of the allowance it made to the defendants as damages for delay in completing the building. The defendants had been conducting a silk manufacturing business with establishments at Middletown and Paterson, New Jersey, in leased premises at both places. The lease at Paterson was to expire on January 1st, 1924, and the continuance of the tenancy at Middletown was uncertain because it was one from month to month and the lessor had become bankrupt. The new building could accommodate the equipment of both these factories and the defendants planned to move it in as soon as the building was completed. These facts were all made known to the plaintiff in connection with the negotiations as to the time which should be allowed for its completion, although he did not know the amount of rentals which the defendants were paying. During the delay in completing the building the defendants continued their occupancy of, and payment of rent for, both the premises they had leased, and, indeed, continued to occupy the premises at Paterson down to the time of trial, in April, 1925. The trial court allowed as damages the rentals paid by the defendants for the premises at Middletown and Paterson, less a certain amount paid at the latter place for light, power, and janitor service. Ordinarily the damage for delay in constructing a building would be measured by its rental value for the period of that delay. 3 Sutherland on Damages (4th Ed.) § 703; 9 Corpus Juris, 790. Rental value is given " 'not as specific damage, but as a fair average measure of compensation.' " *Hutchinson Mfg. Co.* v. *Pinch,* 91 Mich. 156, 160, 51 N. W. 390. The rule does not preclude,

in a proper case, a recovery as special damages of rentals actually paid during the delay for other premises, where the owners, to the knowledge of the contractors, were constructing the building for the purpose of saving those rentals by housing their business in their own premises; such payments would be a very direct result of the delay and the parties in making the contract would reasonably be assumed to have contemplated this element of loss; and that the contractors did not know the amounts of the rentals being paid would not alter the situation. *Hubbard* v. *Rowell*, 51 Conn. 423, 426; *Cohn* v. *Norton,* 57 Conn. 480, 490, 18 Atl. 595; *Jordan, Marsh & Co.* v. *Patterson,* 67 Conn. 473, 480, 35 Atl. 521; *Barlow Bros.* v. *Lunny,* 102 Conn. 152, 118 Atl. 115; and see *C. W. Hunt Co.* v. *Boston Elevated Ry. Co.,* 199 Mass. 220, 239, 39 N. E. 446. In *Stevens* v. *Yale,* 101 Conn. 683, 690, 127 Atl. 283, we said, in speaking of the breach of an agreement to repair leased premises: "The difference between the rental value of the premises with the repairs and without the repairs will often be the proper measure of damages, but cases have arisen and are bound to arise which require another rule. Those injuries which the parties may fairly be held to have contemplated as a consequence of the breach when applied as a measure of damages will reach juster results in more cases than any other." "The underlying principle is that the damages should be estimated according to the real injury arising from" the breach. *Musial* v. *Kudlik,* 87 Conn. 164, 170, 87 Atl. 551. Where a builder delays the construction of a building, and the owner is thereby compelled to continue his occupancy of and to pay rentals for, leased premises, the amount of such payments may well constitute the real injury arising from the breach of contract, and if so, they would be properly recoverable. If it be shown

that the continued occupancy of the leased premises resulted in savings to the defendants in the expenses of operating their business, such savings should be offset; *Lewis* v. *Hartford Dredging Co.*, 68 Conn. 221, 227, 35 Atl. 1127; *Bridgeport* v. *Aetna Indemnity Co.*, 93 Conn. 277, 286, 105 Atl. 680; but in the absence of a finding that there were such savings, we cannot presume them in this case. The court was not in error in the rule of damages it adopted.

The defendants claimed a further allowance because, during the continuance of the delay, the labor cost of manufacturing silk at Paterson was greater than the labor cost at their Middletown establishment. Our decision as to this claim might rest upon the fact that it does not appear that the defendants would have been saved this increased cost had the building been completed as agreed; indeed, the finding indicates the contrary to be true. But, that aside, the facts fall far short of showing that the parties could reasonably be assumed to have contemplated, when they inserted in the contract the provision in question, that the defendants were to be compensated for any losses of this nature. There is not the same direct relationship between the delay and the increased cost of manufacturing at Paterson that there is between that delay and the rentals paid for the leased premises during its continuance. In the course of the negotiations the defendants stated that the labor cost at Paterson was higher than at Middletown; but, on the situation disclosed, it could not reasonably be assumed that the parties contemplated the increased labor cost at Paterson as a loss to be made good to the defendants should the plaintiff fail to complete the contract within the time fixed.

The plaintiff claims that, because of the delay in his performance, the defendants did not make the pay-

ments provided in the contract at the times specified, and so interest upon the sums withheld ought to be set off against the damages they claim, for their use of the money. This is of course not a situation where interest could be allowed as damages for withholding money due to another. The only basis for plaintiff's claim would be that the defendants were under an obligation to minimize their loss from the plaintiff's breach of contract. If it appeared that the defendants had actually profited from not being compelled to make the payments promptly, the plaintiff might perhaps be entitled to have that profit offset, but that does not appear. The standard set as measuring the obligation of an injured party to minimize his damage is that of reasonable conduct; *Pratt* v. *Dunlap,* 85 Conn. 180, 186, 82 Atl. 195; *Bridgeport* v. *Aetna Indemnity Co.,* 93 Conn. 277, 285, 105 Atl. 680; and we certainly cannot say that that standard would require the defendants to attempt to make a profit from their possession of the sums withheld.

There is error in part on plaintiff's appeal, the judgment is set aside and the cause remanded with direction to enter judgment for the plaintiff for the amount found due him in the judgment appealed from, $14,-585.89, with the addition of $372, being the amount deducted by the trial court because of the use of tile in the construction of the rain-water drains, in all, $14,957.89.

There is no error on defendants' appeal.

In this opinion the other judges concurred.