MARTHA F. RUSCITO v. F-DYNE ELECTRONICS
COMPANY, INC.

(two cases)

ANTHONY JAMES RUSCITO v. F-DYNE ELECTRONICS
COMPANY, INC.

ANTHONY J. RUSCITO v. F-DYNE ELECTRONICS
COMPANY, INC.

(two cases)

ANTHONY J. RUSCITO, GUARDIAN (ESTATE OF
MARIANNE RUSCITO) v. F-DYNE ELECTRONICS
COMPANY, INC.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

150

Argued October 17, 1978—decision released March 27, 1979

*Samuel J. Bernstein,* for the appellant (defendant).

*Edward M. Sheehy,* with whom, on the brief, was *Ralph C. Crozier,* for the appellees (plaintiffs).

LOISELLE, J. The plaintiffs, the Ruscito family, brought six separate suits against the defendant, F-Dyne Electronics Company, Inc., four of which were to recover on promissory notes that were due and owing, and two of which were to recover unpaid salaries. All of these actions, which were ultimately consolidated for trial, arose in connection with the sale by the plaintiffs of F-Dyne Electronics Company, Inc., a Connecticut corporation, hereinafter designated as F-Dyne Connecticut, to Primus Corporation, the corporate owner of the defendant F-Dyne Electronics Company, Inc., a New York corporation, hereinafter designated as F-Dyne New York.

Anthony J. Ruscito, his wife Martha F. Ruscito, and their children, Anthony James Ruscito and Marianne Ruscito, incorporated their partnership into F-Dyne Connecticut in July of 1966. F-Dyne Connecticut was engaged in the business of supplying capacitors for computers, mostly in the communications area. Anthony J. Ruscito, Martha F. Ruscito, Anthony James Ruscito and Marianne Ruscito all made loans to the partnership from money kept in their respective bank accounts prior to the partnership's incorporation. The total amount of the loans made by the Ruscito family to the partnership as of July 1, 1966, was $79,285.08.

The minutes of a special meeting of the board of directors of F-Dyne Connecticut held on July 5, 1966, contained a resolution authorizing its officers to execute memoranda or statements of indebtedness to the Ruscitos for $79,285.08, and authorizing and empowering them to execute and deliver the necessary documents evidencing the indebtedness of the company. The trial court found that those minutes were part of the contract of sale of F-Dyne Connecticut to Primus. Pursuant to the above resolution in 1966, Anthony J. Ruscito, the president of the company, prepared the notes evidencing the indebtedness of F-Dyne Connecticut to the Ruscito family for $79,285.08. There were four notes, one to each of the Ruscitos. The notes to Anthony J. Ruscito and Martha F. Ruscito were each for 26 percent of the $79,285.08. The children each held notes for 24 percent of the total indebtedness. Each of the notes was a demand note which provided for 7 percent interest, attorney's fees and costs of collection.

The June 30, 1967 balance sheet of F-Dyne Connecticut listed "$79,286.00 Due to Stockholders" of

F-Dyne Connecticut. This represented the money the Ruscitos had loaned the company as evidenced by the 1966 notes. The June 30, 1967 balance sheet listed "Retained Earnings $24,834.00." This represented the earnings of the corporation that had not been distributed for the year July 1, 1966, through June 30, 1967. The June 30, 1967 balance sheet also listed "Dividends Payable" in the amount of $12,193. This balance sheet was prepared at the request of Primus Corporation by Irwin Winston, a partner in the accounting firm of Holmes and Davis, which had been previously recommended by the principal owners of Primus.

On November 24, 1967, Anthony J. Ruscito withdrew $50,000 from F-Dyne Connecticut by a check payable to the Chemical Bank of New York and deposited it in his own account at the same bank. He used the money to pay off the $24,834 in retained earnings listed on the June 30, 1967 balance sheet, plus 7 percent interest from July 1, 1967, to November 24, 1967. Ruscito used the balance of the $50,000 to pay off a portion of the $79,285.08 due to stockholders, plus interest of 7 percent from July 1, 1967, to November 24, 1967. This left a balance of $57,075 due to stockholders.

On or about November 27, 1967, Anthony J. Ruscito submitted a preliminary agreement for the sale of F-Dyne Connecticut to Primus. The preliminary agreement contained information on the four promissory notes at issue in this case. The negotiations for the sale went on from late November, 1967, until February 26, 1968. They were tenuous and very difficult. From November until the sale was closed on March 4, 1968, the trial court found that the accountants from Holmes and Davis had com-

plete access to F-Dyne Connecticut and all of its records. Raymond Fox, who was treasurer of F-Dyne New York from March 4, 1968, on, participated in the negotiations and was aware money was owed by the corporation to the Ruscitos.

A written contract of the sale was executed on February 26, 1968. The sale price was $1,063,000. The closing date was March 4, 1968. The agreement contained a clause in which the sellers warranted that the June 30, 1967 balance sheet and the June 30, 1967 profit and loss statement were true, complete and prepared in accordance with generally accepted accounting principles. Paragraph 14 of the agreement[1] referred to the promissory notes made out to the Ruscitos[2] and outlined the manner in which they

---

[1] Paragraph 14 of the sales agreement provided: "At the closing hereunder, sellers shall be paid by the company the balance due to them from the company on account of loans or dividends payable, not to exceed the aggregate of the amount shown as 'Due to Stockholders,' 'Dividends Payable' and 'Retained Earnings' in the financial statements of the company as of June 30, 1967, hereinabove referred to, to the extent that such sums have not been paid subsequent to said date, provided, however, that such payment to sellers shall be limited to the amount, if any, by which the company's cash on hand exceeds the sum of $50,000 plus other amounts payable by the company. In the event that there is a balance due the sellers pursuant to this section 14 after the payment at the closing, as aforesaid, payments shall be made to sellers by the company or its successors in interest on account of such balance on the last business day of each succeeding month, until such balance is paid in full; provided, however, that any and all such payments to sellers shall be limited to the amount, if any, by which the cash on hand of the company or its successor in interest exceeds the sum of $50,000.00, plus other amounts payable by the company or its successors in interest. Any balance remaining due the sellers pursuant to this section 14 and not previously paid shall be paid to them one year after the date of closing."

[2] On or about February 23, 1968, Anthony J. Ruscito updated the four notes held by himself, his wife Martha, and his children, by writing four new notes to reflect that he had been appointed guardian of the children's estate as requested by Primus and to reflect that the balance of the payment of $50,000 was applied to each of the notes on November 24, 1967.

should be paid. One clause of the agreement provided that F-Dyne Connecticut should be operated for the account of the buyer from July 1, 1967, to the date of the closing. The agreement also stipulated that there were no outstanding liabilities except those enumerated in the agreement and warranted that there had been no changes in the business except those that were in its ordinary course.

On or about April 9, 1968, about a month after the sale of the corporation, the Ruscitos received on account $35,000 from F-Dyne Connecticut (then controlled by Primus) on the four promissory notes involved here. On the back of the $35,000 check was written "Payment on account pursuant to Section 14 of contract dated February 26, 1968." This money was applied to principal and interest against the four notes held by the Ruscito family in equal proportion. According to paragraph 14 of the sales agreement, the balance was to be paid in full on March 4, 1969, one year from the closing. The defendant F-Dyne New York[3] refused to pay the balance due and owing on the four promissory notes and the salaries of Anthony J. Ruscito and Martha F. Ruscito for 1967. By writ, summons and complaint each member of the Ruscito family brought an action against the defendant F-Dyne New York on his or her respective note claiming that payment was past due and owing. In addition, both mother and father brought separate actions for salaries they claimed were due and owing. The defendant counterclaimed, alleging fraud, trickery or misrepresentation on the part of the plaintiffs. The trial court found the issues in favor of the plaintiffs on their

[3] On or about May 31, 1968, F-Dyne New York was the assignee of Primus, the buyer. It assumed all the liabilities of F-Dyne Connecticut.

complaints and on the defendant's counterclaims. The defendant has appealed, alleging as error: (1) that the court drew an unfavorable inference from the failure of the accountant to testify; (2) that the notes sued upon should have been excluded under the parol evidence rule or doctrine of merger; (3) that the computation of the amount due and owing under the notes is incorrect; (4) that the computation of the amount of salaries due is incorrect; and (5) that the court failed to find a breach of the warranties in the sales agreement.

I

In its brief the defendant argues that the trial court made an improper inference that contaminated most of the court's findings. It is claimed that the court "believed" that the defendant should have called Irwin Winston, the accountant, or another member of the firm of Holmes and Davis, as a witness. The defendant contends that it is quite clear from the court's conclusions that the court was inferring that if the accountant did testify, he would have testified adversely to the defendant. The defendant bases its contention not on any enunciated inference but on the fact that the trial court found that neither Winston nor any member of his firm testified,[4] and that in its conclusions of law the court stated that the defendant "failed to call" Winston or any member of his firm to testify.[5] Although there is no

[4] In one paragraph of its finding, the court found: "Neither Irwin Winston nor any members of the firm of Holmes & Davis testified in the above entitled actions."

[5] In a paragraph of its conclusions, the court stated: "The defendant failed to call either Irwin Winston or any other member or partner of Holmes & Davis to testify concerning the balance sheets of June 30, 1967, and May 31, 1968, or concerning the amounts shown on the balance sheets to be due to the Ruscito family."

direct inference, the defendant asserts that the court's comments on the "Motion to Reargue" prove its claim.

One of the issues of this case was whether the principals of the defendant knew of the existence of the four promissory notes before the contract for sale was executed or thereafter when suit was brought. It was a highly contested issue. The defendant offered considerable evidence to establish that it was unaware of the notes, unaware of the payment of interest, and unaware of the various payments on them until well after the contract was signed. Despite this, the court found that the accountants did see the notes. The defendant claims that the court rested its finding of the defendant's knowledge on the adverse inference raised by the defendant's failure to call Winston or a member of his firm to testify. The defendant also contends that the court used the inference raised by failure of the accountant to testify as the basis for its finding that the four notes were seen by the accountant for Primus. We disagree.

Neither the court's finding nor its memorandum of decision contains any indication that the court drew an unfavorable inference from the failure of Winston or any member of his firm to testify. Rather, it found that the preliminary agreement contained reference to the notes; that the balance sheet of June 30, 1967, showed the indebtedness; that the notes themselves were in F-Dyne Connecticut's files; and that the defendant and its accountants had unrestricted access to the files. Further, and most importantly, the defendant paid $35,000 on the debt on April 9, 1968, a month after the sale of the com-

pany, and this transaction is reflected in F-Dyne's May 31, 1968 balance sheet made out by the defendant when it had complete control.

The conclusions of liability on the notes were well supported by these findings and the mention of the absence of the accountants at the trial relates only to the fact that the accountants, who had access to all the files, did not testify contrary to the evidence produced by the plaintiffs. There was no reason to draw an unfavorable inference from their failure to testify. Mere mention of the absence of a witness does not necessarily indicate that the court drew an unfavorable inference especially where the conclusions are well supported by the evidence produced without resort to such an inference.

The defendant's reliance on the comments of the court[6] at the time of the "Motion to Reargue" is misplaced. The court's comments were tantamount to stating to the defendant that if it wanted to rebut the evidence the plaintiffs had submitted, which was believed by the court, it, the defendant, could have put on such evidence. This observation by the court was not an acknowledgment that an unfavorable inference was drawn.

## II

The defendant's second argument is that the agreement between the parties specifically provides for the method of payment of the debts to the plain-

[6] "I will tell you what impressed me the most; it was the lack of testimony of the man that sat there in that office, the accountant. I didn't see him, and I cannot believe that he didn't know what was going on at all times. He came from an exceptionally reputable firm. I didn't hear from the man. He could have come in here and said, 'I saw the notes.' 'I didn't see the notes.' 'I saw the notation.' 'I didn't see the notation.' "

tiffs and any notes, interest on notes, payment of reasonable attorney's fees and payment on interest on "Retained Earnings" should be excluded under the parol evidence rule or under the doctrine of merger. The defendant's central defense in this case is that it was not aware of the existence of the notes on which these actions were brought until the actions were actually brought. Its basic claim is that there were no notes or, if there were, they were fraudulently procured. Initially, the plaintiffs brought four separate actions on the four separate notes. In each separate complaint the respective plaintiff alleged that the defendant's indebtedness for which he or she was seeking to be paid was evidenced by F-Dyne Connecticut's notes. In its "Substituted Answers" the defendant admitted the respective paragraphs containing the allegation of the existence of the notes. But by way of a defense it contended that the notes were null and void for lack of consideration or that the defendant had already paid the amount due or at least the maximum stipulated in the agreement. The defendant did not raise the parol evidence rule as a bar until it reached this court.

In no instance in its pleadings did the defendant directly claim that the agreement (specifically paragraph 14) controlled or superseded the promissory notes. The four suits were brought not to enforce the contract, but to recover monies due and owing under the notes. The plaintiffs' complaints do not rely on the agreement. If, however, the agreement forecloses the bringing of actions for any debt owed by the corporation except for those provided for, the defense relating to the parol evidence rule must be considered.

"The parol evidence rule is a rule of substantive law rather than a rule of evidence, and the essence of an objection under it is that even if the evidence objected to is admitted, it would be ineffective, and thus immaterial, because it could not legally affect the rights of the parties as defined in the writing. *Nagel* v. *Modern Investment Corporation,* 132 Conn. 698, 700, 46 A.2d 605." *Shelton Yacht & Cabana Club, Inc.* v. *Suto,* 150 Conn. 251, 255, 188 A.2d 493 (1963). The claims of the parties in their briefs and the extensive finding of 362 paragraphs do not contain any indications of whether the issue was brought forth before the trial court. We need not determine at this time whether this court would review it if it were clearly shown that the issue was never brought to the attention of the trial court. See Practice Book, 1978, § 3063; *O'Connor* v. *Dory Corporation,* 174 Conn. 65, 71, 381 A.2d 559 (1977). On the state of the record before us, the issue is considered.

The gist of the defendant's argument is that the wording of paragraph 14, that "[a]t the closing hereunder, sellers shall be paid by the company the balance due to them from the company on account of loans or dividends payable, not to exceed the aggregate of the amount shown as 'Due to Stockholders,' 'Dividends Payable' and 'Retained Earnings' in the financial statements of the company as of June 30, 1967," coupled with the merger clause in the agreement, limits the plaintiffs to an action on the contract. It contends that there was nothing in paragraph 14 to indicate that there were or would be any documents outside of the agreement itself and that paragraph 14 contains no reference to payment of interest or attorney's fees in case of default.

In *Maier* v. *Arsenault,* 140 Conn. 364, 367–68, 100 A.2d 403 (1953), this court outlined the parol evidence rule: "It is, of course, fundamental, as a matter of substantive law, that the terms of a written contract which is intended by the parties to set forth their entire agreement may not be varied by parol evidence. *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* 130 Conn. 12, 16, 31 A.2d 393; *Nagel* v. *Modern Investment Corporation,* 132 Conn. 698, 700, 46 A.2d 605. It is equally fundamental, however, that when the words used in a written contract are uncertain or ambiguous, parol evidence of conversations between the parties or other circumstances antedating the contract may be used as an aid in the interpretation of the contract, that is, in the determination of what was the intent of the parties which was expressed by the written words. *Maltby, Inc.* v. *Associated Realty Co.,* 114 Conn. 283, 289, 158 A. 548; *Gray* v. *Greenblatt,* 113 Conn. 535, 539, 155 A. 707; *Mazzotta* v. *Bornstein,* 104 Conn. 430, 439, 133 A. 677; *In re Curtis-Castle Arbitration,* 64 Conn. 501, 514, 30 A. 769." In *Maier,* this court found that the phrase "ready for occupancy" used in a bond for deed did not have any clear and definite meaning and therefore allowed parol evidence from the parties on what they meant.

The parol evidence rule as mentioned above prohibits the introduction of evidence that varies or contradicts an exclusive written agreement whether or not there is an objection. Paragraph 14 of the agreement expressly refers to the existence of outside obligations: "At the closing hereunder, sellers shall be paid by the company the balance due to them from the company *on account of loans* or dividends payable." (Emphasis added.) The word "loans" is not specifically limited; it suggests that

outside amplification is needed. The notes were admissible under the parol evidence rule to explain what the parties were referring to as "loans." Therefore, the parol evidence rule is not a bar here as the word "loans," not being specific, may be explained by reference to the notes. *Maier* v. *Arsenault,* supra, 368. The notes were properly admitted.

### III

The defendant's third contention is that the court erred in its computation of the amount due and owing under the notes. The defendant is not claiming that the trial court's calculations were wrong, but rather that certain expenditures and payments should not have been allowed or should have been subtracted by the court from the amount due on the notes. The defendant specifically challenges four transactions: (1) the allowance of 7 percent interest on the retained earnings; (2) the corporation's payment of the probate bonds for the minor Ruscitos; (3) the expenditures for the children's college expenses; and (4) two unexplained but recorded withdrawals by Anthony J. Ruscito and Martha F. Ruscito.

The defendant's argument is unclear but it seems to be contending that the plaintiffs had no authority to pay themselves 7 percent interest on the retained earnings. According to the findings which the defendant has not directly attacked, the June 30, 1967 balance sheet of F-Dyne Connecticut lists an item, "Retained Earnings $24,834.00," which represents earnings of the corporation that had not been taken out for the year July 1, 1966, through June 30, 1967. Anthony J. Ruscito was the president and chairman of the board of directors of F-Dyne Connecticut. On November 24, 1967, Ruscito withdrew

$50,000 from F-Dyne Connecticut by check payable to the Chemical Bank of New York and deposited the sum in his own account in the same bank. Out of the $50,000, he took $24,834 plus 7 percent interest to pay off the "Retained Earnings" listed on the June 30, 1967 balance sheet. At some undisclosed time, Ruscito, as president and chairman, prepared a note of F-Dyne Connecticut payable to the Ruscito family for $24,834 plus 7 percent interest and placed it in F-Dyne Connecticut's files. On November 27, 1967, Anthony J. Ruscito submitted a preliminary agreement of sale notifying Primus of the existence of notes held by himself and his family. This agreement was prepared after the retained earnings had already been paid to the Ruscitos. This agreement indicates that those notes were interest free.

As president and chairman of the board, Anthony J. Ruscito had the authority to issue notes on behalf of F-Dyne Connecticut and bind it for interest on the retained earnings after the earnings were due and payable. *Osborne* v. *Locke Steel Chain Co.*, 153 Conn. 527, 536, 218 A.2d 526 (1966). F-Dyne Connecticut was a Subchapter S corporation. All the earnings of the corporation during the taxable year had to be reported as income by the stockholders. Thus, the Ruscitos as stockholders had a "right" to the money and they would be taxed on it. The question in issue is whether the 7 percent interest paid on the retained earnings was actually due.

As previously noted, the finding does not state when the notes were made. Since the court's conclusion as to interest on those notes depends in part on the circumstances under which the notes were made, reference is made to the appendices to the briefs and to the transcript. Practice Book, 1978,

§ 3049; *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 275, 320 A.2d 811 (1973). According to the testimony in the defendant's appendix to its brief, Anthony J. Ruscito testified on cross-examination regarding the notes made for retained earnings as follows: "Originally they were interest free and they were subsequently changed to interest-bearing notes. When we thought the company was going to be sold we decided to pay ourselves interest because there were some negotiations about the company keeping the profit from July 1 on." The finding shows only a debt of $24,834 as retained earnings on July 1, 1967, in the F-Dyne Connecticut statement. It is apparent from the above recited testimony that it was only at some undisclosed time following September, 1967, when negotiations first started for the sale of the company, that the Ruscitos decided that interest should be charged on the retained earnings. It is fundamental that "[i]nterest by our law is allowed on the ground of some contract express or implied to pay it, or as damage for the breach of some contract, or the violation of some duty." *Selleck* v. *French,* 1 Conn. 32, 33 (1814); *Healy* v. *Fallon,* 69 Conn. 228, 235, 37 A. 495 (1897). At the time of the instant transaction, General Statutes § 37-1 provided: "The compensation for forbearance of property loaned at a fixed valuation, or for money, shall, in the absence of any agreement to the contrary, be at the rate of six per cent a year; and, in computing interest, three hundred and sixty days may be considered to be a year." This statute, as it existed in 1967, did not require that the legal rate of 6 percent be added where the itemizing of the amount due does not call for interest to be paid.[7] As there

---

[7] Subsection (b) of General Statutes § 37-1, which allows interest unless otherwise provided by agreement, was not enacted until 1971.

was no express provision to pay interest at the time when these earnings were due and payable on July 1, 1967, resort must be had to whether such interest payment can be implied. The finding reveals no such implication. This is especially apparent since the executive officer of the corporation indicated in his testimony that it was not until sometime between September and November, 1967, that it was decided the debt was to bear 7 percent interest.

Whether interest may become due on a debt which is intended to be interest free after demand is made for payment or notification given to the debtor need not be determined at this time. The finding reveals that no demand was made prior to payment, and there is no finding that notification was ever given to the corporation that interest was to be demanded on the debts, prior to actual payment. Also, it is not clear if the notes in question were prepared prior to payment. Further, the sales agreement which was prepared only after the payment of the "Retained Earnings" indicates that such notes were interest free. The court was in error in awarding interest on the item of "Retained Earnings," which interest was computed by the court to be $705.

The defendant next argues that the court erred in not deducting from the balance due on the notes amounts withdrawn from the corporation for personal expenses. These amounts were not included in the finding but were claimed in the draft finding. An examination of the defendant's appendix makes it clear that such items were in fact personal withdrawals. These items are as follows: $9000 to Anthony J. Ruscito; $95 to a college fraternity; $1520 to Smith College; $933 to Worcester Polytech;

$1550 to Smith College; $400 to a college fraternity; $920 to Worcester Polytech; and $120 for a probate bond. As Anthony J. Ruscito admitted that the $9000 check to himself and every check to Worcester Polytech, Smith College and a fraternity were personal checks, those paragraphs were admitted and undisputed and they are thus added to the finding.

The court specifically found that the probate bond was not a personal withdrawal because Primus requested that the minor stockholders have a guardian appointed for them. Although the principals of Primus requested that a guardian be appointed for the minor Ruscitos, such would not relate to the business of the corporation but only to the transfer of stock of the minor stockholders in the company. The buyers were only seeking to protect themselves from a disaffirmance of contract from stockholders who were minors. See *Shutter* v. *Fudge,* 108 Conn. 528, 143 A. 896 (1928). Such protection was not related to the income or expenses of the corporation or its management. The court was in error in determining that the amount of $120 for expenses relating to the guardianship of the minor Ruscitos was a business expense.

The defendant claims that a check payable to Martha F. Ruscito in the amount of $2750 was a personal withdrawal. The evidence relied upon by the defendant is the testimony of Anthony J. Ruscito that he could not recall what the $2750 check was for. It is apparent that the court rejected the evidence of the defendant's treasurer that Ruscito had told him that this withdrawal was a personal withdrawal. With this as the only evidence presented on the issue, the trial court found that the defendant had failed to sustain its burden of proof as to its special defense and counterclaim.

The general rule is that the burden of proving a setoff or counterclaim is on the defendant. *Gager* v. *Carlson,* 146 Conn. 288, 290, 150 A.2d 302 (1959). Anthony J. Ruscito's testimony was not sufficient to establish that the withdrawal was personal. A defendant prevails on a counterclaim not by reason of the weakness of the plaintiff's case, but because of the strength of his own. *Silva* v. *Hartford,* 141 Conn. 126, 128, 104 A.2d 210 (1954); *Thaw* v. *Fairfield,* 132 Conn. 173, 179, 43 A.2d 65 (1945). The trial court was not in error in finding that the defendant had not sustained its burden of proof on this item.

The expenditures of $14,538 by F-Dyne Connecticut were for the personal benefit of the plaintiffs and were above and beyond their salaries. None of the listed expenses was a legitimate business expense. Most important is that the sales agreement provided that the plaintiffs agreed to operate the corporation from July 1, 1967, for the account of the buyer.

The balance sheet of June 30, 1967, does list $12,193 as due on dividends payable to the plaintiffs. The balance sheet of May 31, 1968, does not show an item for dividends payable. The court found that these dividends were paid by a series of personal withdrawals. It is evident, although not explicitly stated in the finding, that the court attributed the above mentioned personal withdrawals as payments toward dividends due. The defendant also considers this to be the case; it claims, however, that the withdrawals exceeded the dividends due and claims the excess as a setoff to the amounts due under the notes payable.

The personal withdrawals of $14,538 exceeded the dividends due of $12,193 by $2345. In the sales agreement under paragraph 11 (c)[8] any nonfulfillment or omission should be indemnified by the sellers. It is specified, however, for whatever reason, that the sellers would only be liable for such loss or damage which exceeds $2500. In this instance, the overdrawing did not exceed $2500. Further, there is no indication that any written claim of such overdrawing was made within a year from the date of closing. The court was not in error in not deducting the personal withdrawals from the amounts due on the notes payable.

## IV

The defendant's next claim of error is that the court incorrectly calculated the amount of salaries due to Anthony J. Ruscito and Martha F. Ruscito.[9] The court found on the actions to recover salaries that the defendant owed Anthony J. Ruscito $12,500. The defendant contends that it owed at most the sum

[8] Paragraph 11 (c) of the contract of sale provides in pertinent part: "11. The sellers jointly and severally agree to and shall indemnify and hold harmless . . . (c) The buyer or its assignee, and/or the company or its successors in interest, as the case may be, with respect to all loss or damage resulting from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of the sellers under this agreement or from any misrepresentation in or omission from this agreement or any certificate or other instrument furnished or to be furnished to the buyer hereunder, including the costs, legal and other expenses incident thereto, except as provided in sections 11 (a) and 11 (b) above; provided, however, that the obligation of the sellers under this section 11 (c) shall be limited to the amount by which the aggregate of all such loss or damage exceeds the sum of $2500, and further provided that sellers shall have no liability under this section 11 (c) with respect to liabilities or claims of which written notice has not been given to the sellers within one year from the date of closing."

[9] Two of the actions consolidated in the instant case were actions by Anthony J. Ruscito and Martha F. Ruscito respectively to recover salaries alleged to be due and owing them.

of $4166.67. According to the computations of the defendant, Anthony J. Ruscito's salary for the entire year in question (July 1, 1967 — June 30, 1968) was $25,000 in accordance with the terms of the sales agreement. Broken down to monthly payments, this would be $2083.33 per month. Ruscito worked for eight months before Primus' takeover. Eight times the monthly salary of $2083.33, per the defendant, is $16,666.67. Ruscito admits that he received $12,500. The defendant's contention is that the amount owed Ruscito is $16,666.67 minus $12,500, not $25,000 minus $12,500, because Ruscito did not work a full year.

The reasoning behind the figure for Martha F. Ruscito's salary was similar. Her salary for the current fiscal year, argues the defendant, was $8000, according to paragraph 4 (o) and exhibit M of the agreement.[10] This breaks down to a monthly rate of $666.67. She was employed for eight months, so her salary should have been $5333.33. She

_____

[10] Paragraph 4 (o) of the agreement provides the following: "Exhibit M, annexed hereto, includes a true and complete statement as of the date of this agreement, certified by the company's treasurer, showing (i) the names of all salaried persons whose compensation from the company for the current fiscal year will equal or exceed $5000, together with a statement of the full amount paid or payable to each such person for services rendered or to be rendered during such year and the basis therefor."

Exhibit M sets forth the following:
"Salaries

| | |
|---|---|
| Anthony J. Ruscito | $25,000 |
| Martha F. Ruscito | 8,000" |

"I, Anthony J. Ruscito, Treasurer of F-Dyne Electronics Co., hereby certify that the foregoing is a true and complete Statement of Salaries paid to salaried personnel of said Company and fringe benefits for all employees of the Company.

Anthony J. Ruscito      /s/
_____
Anthony J. Ruscito"

received $4000. According to the defendant, this leaves a net salary due to her of $1333.33. The gist of the defendant's argument is that under the agreement the salaries of Anthony J. Ruscito and Martha F. Ruscito ($25,000 and $8000) were for a year, not for eight months.

The plaintiffs, on the other hand, maintain that neither the agreement nor any part of the sales contract provides for proration of salary payments.

The trial court found that Anthony J. Ruscito had been paid $37,500 in salary as of December, 1967, and that Martha F. Ruscito had received $4000 by that time. The court further found that on or about February 1, 1968, Anthony J. Ruscito returned by check the net amount of the $25,000 salary payment, which was approximately $17,000, to F-Dyne Connecticut because the working capital was low, and Martha returned approximately $2700. A check was entered into evidence in the amount of $19,780.33 payable to F-Dyne Electronics Company dated February 19, 1968, and signed by Martha F. Ruscito, which represented the return of the net amount to F-Dyne of the $25,000 salary payment received by Anthony J. Ruscito and the net amount of the $4000 salary payment received by Martha, which was deposited to the account of F-Dyne Connecticut. The difference between the sum of $19,780.33 and $29,000 was the withholding for income tax and social security. The trial court found that at the date of closing of the sale of F-Dyne Connecticut to Primus, March 4, 1968, Martha was owed $4000 in salary and Anthony J. Ruscito was owed $12,500. The sum and substance of the defendant's argument is an attack on those findings.

The general rule is that this court will strike a finding where it is unsupported by the evidence. *Fidelity & Casualty Co.* v. *Constitution National Bank,* 167 Conn. 478, 490, 356 A.2d 117 (1975); *Providence Electric Co.* v. *Sutton Place, Inc.,* 161 Conn. 242, 245, 287 A.2d 379 (1971). Exhibit M clearly states that Anthony J. Ruscito's salary is $25,000 and Martha's is $8000. There is nothing in the contract about proration. Terms cannot be added to a contract by interpretation. *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 374, 321 A.2d 444 (1973). The meaning of the terms of a contract can also be shown by the conduct of the parties to the contract. *Taft Realty Corporation* v. *Yorkhaven Enterprises, Inc.,* 146 Conn. 338, 343, 150 A.2d 597 (1959). The initial salary payment was made in December, 1967. At that time, Anthony J. Ruscito and Martha F. Ruscito were paid $25,000 and $4000 respectively. That was not the end of the fiscal year. The natural inference is that the salary was for work done, not for work expected to be done. The defendant did not present any evidence that the salaries were to be prorated or that they were for the complete fiscal year. The conclusions of the court are supported by the subordinate facts and they are not disturbed.

## V

The defendant's final contention is that the court erred in failing to find any breach of warranties. Under paragraph 11 (c) of the sales agreement as previously noted, the Ruscito family personally agreed to save the buyers harmless and indemnify them from any loss from misrepresentation or breach of warranty. The defendant claims the warranties were breached in that (1) Anthony J.

Ruscito retained title to an automobile that had been listed on the June 30, 1967 balance sheet; (2) the salaries of Anthony J. Ruscito and Martha F. Ruscito were increased in contravention of the agreement; (3) the notes in question were not on the balance sheet; and (4) the Ruscitos used corporate funds for payment of personal expenses.

In this argument, the defendant calls into question obliquely the finding of the trial court. Under paragraph 11 (c) of the sales agreement, the defendant was required to give written notice of any claimed breach of warranties, where the aggregate of all such loss or damage exceeded $2500, within one year from the date of the closing. The defendant's letter of February 23, 1969, which was within the one-year time limit, was the only notice given the plaintiffs under paragraph 11 (c) concerning alleged breaches of warranty[11] and none of them is included in the claimed breaches the defendant is arguing here on appeal.[12]

The defendant presented no evidence that it gave notice to the plaintiffs of any of the breaches of warranty claimed on appeal. The court made no finding that the defendant gave the required notice. " 'A condition precedent is a fact or event which

[11] The following are the alleged breaches of which the defendant notified the plaintiffs in its February 23, 1969 letter: (1) failure to disclose alleged commissions due to sales representatives; (2) payments to Anthony James Ruscito amounting to $6107.42 and to Marianne Ruscito aggregating $5527.12 during the last fiscal year; (3) ownership by the Ruscito Group of Arco Winding Machine; and (4) claims of interest on loans to F-Dyne Connecticut in violation of sections 4 and 8 (*l*) of the contract of sale.

[12] The following are the breaches the defendant is arguing on appeal: (1) retention of the automobile; (2) salary claims by Anthony J. Ruscito and Martha F. Ruscito; (3) issuance of notes; and (4) payment of personal expenses of the Ruscito family.

the parties intend must exist or take place before there is a right to performance.' *Lach* v. *Cahill,* 138 Conn. 418, 421, 85 A.2d 481. Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract . . . . *Strimiska* v. *Yates,* 158 Conn. 179, 185, 257 A.2d 814; *McIsaac* v. *Hale,* 104 Conn. 374, 379, 132 A. 916; 5A Corbin, Contracts § 1175, p. 294." *Brauer* v. *Freccia,* 159 Conn. 289, 293, 268 A.2d 645 (1970).

The language of paragraph 11 (c) of the sales agreement is clear and unambiguous. This language plainly indicates that the liability of the sellers for the alleged breach of warranty is conditioned on the buyer's giving notice of such a breach within one year from the date of closing. Under the plain meaning of the contract, notification was a condition precedent to recovery by the defendant against the plaintiffs for the claimed breaches of warranty. Neither the finding nor the draft findings in the record contain any notification of any breach of warranties other than those in the letter of February 23, 1969. The court was not in error in finding for the plaintiffs on this issue.

There is error only in the awarding of interest on the item of "Retained Earnings" which was found by the court to be $705. The cases are remanded to modify the judgments deducting from the awards to the plaintiffs on the notes sued on a sum in the amount of $183.30 plus interest of 7 percent from November 24, 1967, to the date of judgment in each of the cases with docket numbers 139650 and 139652; and to modify the judgments deducting from the

awards to the plaintiffs on the notes sued on a sum in the amount of $169.20 plus interest of 7 percent from November 24, 1967, to the date of judgment in each of the cases with docket numbers 139651 and 139653. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.