UNITED TECHNOLOGIES
CORP., et al.

v.

AMERICAN HOME ASSURANCE
COMPANY.

No. 2:92cv267 (JBA).

United States District Court,
D. Connecticut.

Aug. 23, 2000.

David B. Zabel, Stewart I. Edelstein, Marci J. Silverman, Stuart M. Katz, Cohen & Wolf, P.C., Bridgeport, CT, Kay M. Brady, Stephen M. Goldman, Carolyn M. Branthoover, Thomas J. Smith, Robert Bruce Allensworth, David F. McGonigle, Keith A. Fabi, Michael G. Zanic, Evan A. Bloch, David T. Fisfis, Diane B. Hopper, Terry Budd, C. Michele Kirk, Peter J. Kalis, David R. Cohen, Mary Beth Collery, Thomas M. Reiter, John P. Englert, Michael S. Nelson, Alan W. Tamarelli, Richard W. Hosking, Eric S. Lammers, Heath B. Monesmith, Joseph C. Safar, Jeanne M. Sauer, David P. Anderson, Douglas J. Simmons, Kirkpatrick & Lockhart, Pittsburgh, PA, Patrick J. McElhinny, Amy O. Goodman, Brian F. Saulnier, Joseph R. Gette, Erica D. Merkow, Douglas A. Pearson, Angelica R. Hopwood, Kristen M. Del Sole, Julie V. Stanier, Richard D. Dworek, Matthew R. Swenson, James E. Hannon, Jr., Paul K. Stockman, Joseph L. Luciana, III, Kirkpatrick & Lockhart, Pittsburgh, PA, for United Technologies Corp., Carrier Corp., United Tech Automotive, Inc, plaintiffs.

Robert W. Allen, Noble Francis Allen, Timothy P. Jensen, Tyler, Cooper & Alcorn, New Haven, CT, David A. Silva, Bruce R. Kaliner, Wayne R. Glaubinger, Stuart Cotton, Daniel Markewich, John Mezzacappa, Mitchell S. Cohen, Diana E. Goldberg, Sarah D. Strum, Aaron F. Fishbein, Hilary M. Henkind, Mark J. Weber, William D. Wilson, Todd A. Bakal, Elisa T. Gilbert, Michael T. Altman, Mound, Cotton & Wollan, New York City, Roger E. Warin, William T. Hassler, Libretta A. Porta, Thomas M. Contois, Mark C. Elmer, John L. Jacobus, Ripple L. Weistling, Ellen Hochstedler Steury, John A. Flyger, Edward J. Twomey, Andrew J. Sloniewsky, Stephen A. Fennell, Errol R. Patterson, Heather Doherty Clark, Steptoe & Johnson, Washington, DC, Henry T. Vogt, Simsbury, Jeffrey R. Lerman, Leonard A. Busby, Howard J. Bashman, Cynthia B. MacQueen, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for American Home Assur. Co., defendant.

## RULING ON DEFENDANT'S MOTION FOR A REDUCTION IN THE JURY'S WINDSOR LOCKS VERDICT BECAUSE OF UTC'S SETTLEMENTS WITH ITS LIABILITY CARRIERS (DOCS. # 1013 & # 1020)

ARTERTON, District Judge.

This insurance coverage action was brought by United Technologies Corporation and its subsidiaries, Carrier Corporation and United Technologies Automotive (collectively, "UTC") against its insurer, American Home Assurance Company ("American Home") to recover for amounts expended in remediating environmental contamination at plaintiff's Windsor Locks facility, among numerous other sites, and for statutory and common law damages. Familiarity with the factual and procedural history of this case is presumed from the Court's prior rulings. *See* Doc. # 595 (Ruling Granting in Part, Denying in Part Motion for Summary Judgment); Doc. # 953 (Ruling Denying Defendant's Motion for Judgment as a Matter of Law on Count One Regarding Windsor Locks Site).

In this installment of the defendant's post-trial motions, it seeks to have the jury verdict on plaintiff's Windsor Locks site reduced to account for UTC's settlements with its liability insurers in two other actions brought in state courts. Briefly, UTC originally brought suit against all its historic liability insurance providers and against American Home, its historic property insurer, seeking insurance coverage for environmental contamination at 122 different locations across the country, 87 UTC-owned sites and 23 non-owned dump sites. In the state actions, the insurer-defendants brought a number of procedur-

al challenges, resulting in the litigation being split into three different actions. The case against UTC's historic liability insurance providers continued in Massachusetts state court (the "Massachusetts Action"), while a case against the historic liability insurance provider to a single UTC subsidiary, Carrier Corporation, was initiated in Connecticut (the "Carrier Action"). Most pertinent to this case, in the Massachusetts action American Home sought to dismiss the plaintiff's claims for damage to UTC-owned or controlled property under American Home's property policy, the policy at issue in this litigation, arguing that plaintiff had not pursued the policy's pre-suit procedures. UTC eventually settled its claims against the liability carriers in the Massachusetts Action and the Carrier Action, and from the Court's *in camera* review of the settlement agreements, it received approximately $110 million in settlement payments.

After UTC had complied with the presuit procedures in the policy, it commenced this action in Federal District Court, seeking damages for breach of contract, breach of the covenant of good faith and fair dealing, and for violation of the Connecticut Unfair Trade Practices Act ("CUTPA") for eight of its owned sites. The case on two of the sites, Windsor Locks ("WL") and City of Industry ("COI") went to trial from January to May of 1998, in two phases. The jury returned verdicts in plaintiff's favor for the Windsor Locks site on UTC's breach of contract, common law bad faith and CUTPA statutory claims, and awarded $14,131,093.69 in damages.

Claiming that UTC's simultaneous prosecution of actions against its liability carriers and its historic all-risk property insurer demonstrates that both insurers proportionately liable, American Home seeks a 50% reduction in the Windsor Locks verdict against it to account for the "tens of millions of dollars" that UTC received in settlement from its liability carriers in the Massachusetts Action, alleging

this to have been compensation for the same losses. *See* Def. Substitute Memorandum in Support of a Reduction in the Jury Verdict (Doc. # 1026) at 3. American Home also claims that UTC's settlements of its claims against its liability insurers precluded a contribution action by American Home against those insurers for their share of the Windsor Locks verdict, and that it is therefore entitled to a credit on any recovery obtained in those settlements. UTC opposes American Home's motion, arguing that the settling insurance companies in the Massachusetts action are not defendants in this case, that the insurance policies in question differ substantially, and that the Massachusetts Superior Court has already found that UTC's liability carriers have no coverage obligations with respect to the Windsor Locks site. The Court rejects much of American Home's argument, but still concludes that a setoff is appropriate in this case, although not of the magnitude sought by defendant.

## I. DISCUSSION

### A. General Principles

■ Both parties agree under general principles of insurance law that an insured may not recover twice from multiple insurers of the same risk. Couch on Insurance, 3d Ed., § 175:6. "It is a time-honored rule that an injured party is entitled to full recovery only once for the harm suffered. An insured may not recover double payment of damages under overlapping insurance coverage." *Buell v. American Universal Ins. Co.*, 224 Conn. 766, 774, 621 A.2d 262 (1993). Further, "[t]he right to offset the amount the injured party has received from the other tortfeasor or its insurer is an equitable solution to the joint tortfeasor's loss of the right to contribution as a result of the settlement and release." Couch, § 218:46. The parties use different nomenclature to express this principle, referring to the requested relief as a "reduction," a "credit," or a set off, *see* Def. Substitute Mem. in Support (Doc. # 1026)

at 4, but it is clear from the briefs that the parties share the same understanding of what defendant seeks in its motion: that the $14,131,093.69 jury verdict on the Windsor Locks site be reduced to reflect the settlement payments UTC received in the Massachusetts and Carrier actions.

While plaintiffs charge that American Home has waived this argument by failing to plead offset as a special defense, and points to a recently-submitted Answer that specifically includes a request for an offset in its Twenty–Seventh Affirmative Defense (Doc. # 1051) as proof of this failing, a review of the voluminous pleadings in this case reveals that an answer filed in November of 1993 listed an affirmative defense based on the "other insurance" clauses in the relevant policies. *See* Doc. # 481. As any entitlement to an offset would be based on the "other insurance" clauses in the relevant policies, this answer served to sufficiently notify the plaintiff that a reduction would be sought.

 Whether the claimed right to a setoff was plead as an affirmative defense raises the question of which party has the burden of proof on this issue. UTC unequivocally states, without supporting case citations, that defendant bears this burden, and American Home does not dispute this contention, perhaps because under Connecticut law "[t]he general rule is that the burden of proving a setoff or counterclaim is on the defendant." *Ruscito v. F–Dyne Electronics Co.,* 177 Conn. 149, 411 A.2d 1371 (1979). Defendant uses the terminology "setoff" in the caption to its motion, but a setoff, as employed in *Ruscito,* is a mutual debt between the parties that can be raised in an action brought for the recovery of another debt. *See* Conn. Gen. Stat. § 52–139. The relief sought by defendant here is of quite a different variety, and is more akin to a action for contribution. *See Hanover Ins. Co. v. Fireman's Fund Ins. Co.,* 217 Conn. 340, 586 A.2d 567 (1991) ("The right of action for contribution, which is equitable in origin, arises when, as between multiple parties jointly bound to pay a sum of money, one party is compelled to pay the entire sum. That party may then assert a right of contribution against the others for their proportionate share of the common obligation.") While some states place the burden on the plaintiff to allocate settlement payments to different claims, *see Crown Life Ins. v. Casteel,* 22 S.W.3d 378, 43 Tex. Sup.Ct. J. 348 (January 27, 2000, Texas), Connecticut has not adopted such a rule, and the parties appear not to dispute that defendant bears the burden of proving its affirmative defense. Accordingly, the Court will analyze the question as whether American Home has carried its burden of proving that UTC received funds in settlement for releasing the claims for costs to clean up and remediate the Windsor Locks site under overlapping insurance coverage.

B. Difference Between the Parties and the Policies at Issue in the Massachusetts Action and this Case.

American Home argues that the damages claimed and awarded in this action substantially replicate the damages sought in the Massachusetts action. American Home points to the complaint and other pleadings filed in that case that contain references to groundwater damage and remediation activities at Windsor Locks, as well as listings of specific expenses incurred in the clean-up of Windsor Locks. As plaintiff sought to recover for identical expenses in both actions, American Home's argument follows, the jury verdict must be reduced in order to prevent a double recovery on the part of the plaintiff.

 UTC opposes defendant's motion on a number of grounds, several of which can be dealt with summarily. First, UTC argues that the settlements in the Massachusetts action are unrelated to the instant case, because they involved liability, as opposed to all-risk property, insurance policies. As UTC has consistently sought to elide any differences between liability and property insurance coverage over the course of this litigation, this late recogni-

tion of the distinction between the two is unconvincing. Further, a number of courts have reduced verdicts to account for settlements with carriers under different policies. For instance, in *American Alliance Ins. Co. v. IARW Ins. Co. Ltd.,* 165 F.3d 558 (7th Cir.1999), the property insurer of a warehouse sought contribution from the warehouse's liability insurer for amounts expended when it indemnified the insured for damages to property stored by a third party at the insured's warehouse. The liability insurer argued that its policies did not cover the same risks as the property insurer's policies, because it covered liability to third parties, while American Alliance provided first-party property damage coverage, and that thus it was not liable for contribution. The Seventh Circuit disagreed, pointing out that the difference in the policies only mattered if there were some reason that the property damage would not have rendered the insured liable to the third party. 165 F.3d at 560. While the issue of whether the Windsor Locks damages truly were recoverable under both policies is addressed below, the holding in *American Alliance* indicates that the distinction between the kind of risk insured against in different policies does not preclude contribution (and logically, an offset) if there is some overlap in the coverage. *See also Consolidated Edison Co. v. Aetna Ins. Co.,* 601 F.Supp. 1024, 1025 (E.D.N.Y.1985) (right of contribution between workers' compensation and excess liability policies).

■ UTC also argues that the jury verdict cannot be reduced by amounts received from insurers who were not parties to the case *sub judice.* UTC has cited no law in support of this proposition, other than pointing out that all the case law cited by American Home involved settling insurers that were formerly defendants to the case under consideration. UTC's argument further overlooks the fact that it sued American Home, as well as its liability carriers, in the Massachusetts action; American Home was, however, successful in its motion to dismiss for a failure to comply with internal policy procedures. While its elimination from the Massachusetts case was certainly at American Home's behest, UTC conceded in its brief that it originally sought to bring a "comprehensive insurance coverage action" against all its historic liability and property insurers, but that it had to pursue a subset of these claims in different forums, including this litigation. *See* Mem. in Opp. (Doc. # 1027) at 4. UTC cannot, therefore, argue that its other insurance carriers' status as non-defendants precludes a reduction in this case, when it sought to litigate against all its insurance providers in the first instance. UTC's position on this issue is analogous to a situation where a plaintiff sues three tortfeasors for the same injury, and then due to procedural deficiencies in the suit against one of the defendants, is forced to initiate a separate action. In such a case, there is no reason that settlements in the first action could not be credited against an ultimate verdict in the separate case, if the settlement truly released claims for the same injuries. *See Gould, Inc. v. Continental Cas.,* 401 Pa.Super. 219, 223, 585 A.2d 16 (1991) (recognizing that the proportionate share of liability for various insurers could be determined by examining the relevant policies, even if the settling insurers were no longer parties to the action); *cited in Koppers Co., Inc. v. Aetna Cas. Co.,* 98 F.3d 1440, 1452 (3rd Cir.1996).

The mere dissimilarity in types of policies and identity of parties in the two cases, therefore, is insufficient to preclude a set off in the present case. Determining whether such a set off is appropriate here requires an analysis of the cases that have employed set offs to account for the pro rata share of setting insurers, and an understanding of the rationale underlying them.

C. Third Circuit case law: *Koppers v. Aetna Cas. and Surety Co.*

The case cited by defendant as most directly analogous to the present situation

is the Third Circuit's opinion in *Koppers Co. v. Aetna Cas. and Surety Co.*, 98 F.3d 1440 (3rd Cir.1996). In that case, the insured brought breach of contract and declaratory judgment actions against its liability insurers, both primary and excess, based on their denial of coverage for various environmental property damage claims. Prior to trial, Koppers settled with several of its insurers, leaving only certain excess liability insurers as litigating defendants. After a jury determination that the claims did fall within the coverage of the policies, the district court entered judgment, holding the insurers liable for the full amount of the claim without reducing the verdict to account for the settlements. *Id.* at 1443. The defendant-insurers appealed, and the Court of Appeals reversed.

The Third Circuit, predicting the way in which the Pennsylvania Supreme Court would decide the issue, looked to a ruling by that court which allocated coverage responsibility among six primary insurers, "each of which was obligated to cover an indivisible loss." *Id.* at 1449, *citing J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993). *J.H. France* involved a declaratory judgment action brought by an insured against its comprehensive general liability insurers to determine the insurers' duties to defend and indemnify against asbestos-related bodily injury claims. The Pennsylvania Supreme Court held that "every insurer which was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify J.H. France," 534 Pa. at 39, 626 A.2d 502, and that the insurers whose coverage had been triggered were jointly and severally liable for the full amount of the claim. *Id.* at 40, 626 A.2d 502. The Pennsylvania high court rejected the trial court's scheme, which apportioned damages to the various policies on a pro rata basis according to the length of time each policy was in effect. In reaching this conclusion, the court looked to the language of the various policies, and also to the nature of asbestos-related illnesses, noting that they were not linear in progression such that a pro rata apportionment, based on the length of time the policy was in effect, would logically fit. *Id.* at 39, 626 A.2d 502. The insured was entitled to select the policy or policies under which it would be indemnified; the supreme court added, however, that its holding "does not alter the rules of contribution or the provisions of 'other insurance' clauses" in the applicable policies, and that there was "no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under 'other insurance' clauses or under the equitable doctrine of contribution." 534 Pa. at 41, 626 A.2d 502.

The *Koppers* court noted that all the rationales given in *J.H. France* for selecting joint and several liability applied in the context of insurance for environmental contamination, including the fact that "[a]s with asbestos-related bodily injury, environmental property damage is a progressive harm that, as a practical matter, is indivisible." *Id.*[1] Due to the complicating factors of the presence of excess insurers and the insured's settlements with some primary and excess insurers, however, the Third Circuit recognized that adopting the joint-and-several liability approach of *J.H. France* did not completely resolve the issue. The Third Circuit therefore went on to predict that the state supreme court would modify the *J.H. France* rule "to hold the [defendant insurers] jointly and severally liable for the amount of the loss in excess of the settling insurer' pro rata shares of liability." *Id.* at 1452. The Third Circuit agreed with defendant that the verdict had to be reduced to account for the settlements with other insurers,

1. This characterization is also apt when applied to the facts of this case, for as this Court has previously determined, the damage caused by migration of contaminants cannot be attributed to a particular time period or policy period. *See* March 31, 1999 Ruling on Defendant's Motion for Judgment as a Matter of Law (Doc. # 958).

beginning with the fundamental principle of insurance law which prohibits insurance contracts from conferring a benefit greater than the insured's loss.

> Because we cannot permit a double recovery, and because several insurers have already paid money to Koppers in complete settlement of Koppers' claims against them, we must either (1) reduce the judgment to account for the settling insurers' apportioned shares of liability, or (2) permit the non-settling insurers to seek contribution from the settling insurers and, in turn, permit the settling insurers to seek reimbursement from Koppers.

*Id.* at 1453. The court decided that the Pennsylvania court would adopt the former rule, reducing the judgment to account for the settling insurers' apportioned shares of liability, or the "apportioned share set-off rule."

To reach this conclusion, the court looked to a Pennsylvania Superior Court case applying the same principles. In *Gould v. Continental Cas. Co.*, 401 Pa.Super. 219, 585 A.2d 16 (1991), the insured sued several insurers seeking indemnification for sums paid in settlement of claims by employees alleging exposure to toxic chemicals. One insurer, National Union, sought to join an additional insurer, Travelers, claiming a right of contribution, even though Travelers had already settled with the insured. The trial court denied the motion, holding that Travelers was not "contributorily liable" to National Union, because the terms of National Union's policy with the insured will determine the amount that National Union was obligated to pay:

> In the event that the policy contains an 'other insurance' or 'pro rata' clause, and the coverage for which National Union is being held liable is covered by the insurance provided by Travelers, National Union will be entitled to prorate the amount of coverage. Regardless of whether the other insurers have paid their obligated sums, National Union cannot be made to pay coverage for which the other insurers are liable or for any other amount, unless National Union agreed to such payment in its insurance policy. National Union's right to prorate any applicable policy limits and to receive credit for amounts paid by Travelers does not depend upon the joinder of Travelers in this suit.

Accordingly, the motion to join was denied, as the proportionate share of liability could be determined by examining the limits and policy language of all relevant policies, even if all insurers were no longer parties to the action.

After having decided that joint and several liability allocated the verdict amount among the various insurers in *Koppers*, and that the litigating defendants should have the verdict reduced by a pro rata apportioned shares of the settling insurers, the Third Circuit remanded *Koppers* to the district court to apply the newly-adopted apportioned share set off rule to the verdict amount. The Third Circuit directed the district court to include in such calculations the settlement amounts received from several primary and excess insurers who had issued policies in effect both before and after the litigation period,[2] even though the proportionate shares of these defendants were not known, and even though "all policies that may be found to cover the indivisible loss have not yet been identified." *Id.* at 1455. The Court of Appeals also noted that determining the pro-rata share of the settling defendants, and accordingly the apportioned share of the non-settling, litigating defendants, may require identifying all policies that were triggered, both in and outside the litigation period, if for instance, the applicable allocation calculation determined the proportionate share of liability based on the pro-

**2.** The district court limited the scope of the trial to twelve specific policies in effect over a roughly six-year period.

portion of that insurer's policy limits to the total limits of all triggered policies.

As the non-settling *Koppers* defendants on appeal had conceded that all policies up until 1970 had been triggered, the Court of Appeals found it sufficient to resolve the matter of which pre–1970 policies were triggered. *Id.* at 1456, n. 20. The district court might have to decide whether the post–1970 policies were triggered, however, before it could properly determine the settling insurers' apportioned shares, and in this regard, the Circuit Court noted that although some non-diverse insurers were not parties to the case, "[u]nder Gould ... these insurers need not participate in the case in order for the district court to determine their apportioned shares of liability for purposes of reducing the judgment against the [defendant] insurers," although any finding of coverage would not be binding or preclusive against such non-parties. *Id.* at n. 21. The parties settled before the district court on remand issued a ruling, however, so there is no opinion laying out the methodology for actually calculating such on offset.

## D. Relevancy and Applicability of *Koppers*

■■■ This lengthy explanation of the facts and reasoning of *Koppers* is necessary to distill its theoretical underpinnings, and its applicability to this case. First, while the settling insurers at the heart of the *Koppers* case were defendants in the initial suit, the conclusion makes clear that an insurer need not be a party to a case to have its settlement deducted from the jury verdict in some fashion. Second, as noted above, *Koppers* and the cases on which it relies treat set offs as the preferred alternative to contribution actions, although serving the same purposes. Finally, and most importantly, the opinion contains repeated references "the same indivisible loss," indicating that the policies must be found to have covered the loss, or have been "triggered." And it is this element of *Koppers* that most clearly distinguishes

the present case, as the state court action in Massachusetts ended as to the Windsor Locks site when it was dismissed from the case on summary judgment. Due to the pollution exclusion in the language of the relevant policies and the state court's conclusion that the orders of the Connecticut Department of Environmental Protection did not constitute a "suit" for purposes of liability coverage, Judge Murphy held that the comprehensive general liability policies at issue did not provide coverage for environmental contamination at Windsor Locks. *See* Pl.Ex. 1 at 72–73. The ruling granting summary judgment as to Windsor Locks and eight other sites did not dispose of the case in its entirety, however, as the suit involved coverage claims for 122 sites in 26 states. *Id.* at 1.

American Home argues, based on the pro-rata apportionment rule set out in *Koppers*, that the Windsor Locks verdict should be reduced by 50%. According to this argument, since UTC alleged that its liability carriers *and* its all-risk property carrier (American Home) were responsible for pay for clean-up costs at Windsor Locks, the proportionate liability of the liability carriers and UTC's property carrier is 50%, and the verdict should be reduced accordingly to account for the payments that UTC received in settlement of the Massachusetts action and the Carrier action. As outlined above, however, this analysis is too simplistic, in that it fails to account for the fact that Windsor Locks was but one of 118 sites settled in the Massachusetts case, and the summary judgment ruling dismissing that site from the Massachusetts action. Thus, this Court is not faced with the same factual scenario as was the court in *Koppers*, where all insurers whose policies were triggered were considered jointly and severally liable, because most of the settling insurers have already been found to be not liable for clean up costs at Windsor Locks. Because of this conclusion, the liability policies and the all-risk policy at issue here cannot be considered to have provided

"overlapping coverage." The mere fact that suit was brought against both UTC's liability insurers and its historic all-risk property insurer (American Home), and that UTC *sought* coverage from both insurers, cannot convert the liability insurers and American Home into jointly liable insurers such that the apportioned share setoff rule would apply. Accordingly, the Court rejects American Home's argument that it is entitled to a 50% reduction in the jury verdict under *Koppers.*

E. Possibility of Double Recovery and Defendant's Formula for Calculating Appropriate Set Off Amount

■ American Home seeks to minimize the effect of the summary judgment ruling by positing a rather persuasive hypothetical in which a set off would be appropriate, even absent a judicial finding of liability. Say Company A brings a claim against insurers B, C, and D, two of which (B & C) have policies containing provisions that arguably exclude coverage. Rather than risk litigation, Insurer B settles with Company A, then Insurer C moves for summary judgment on the grounds of the policy provisions, and prevails. If the remaining claim by Company A against Insurer D results in a verdict for the insured, would not that insurer be entitled to "set off" the settlement amount paid by Insurer B, to avoid a double recovery, even in the absence of any judicial finding of liability? This argument looks to the problem facing the Court from the other side of the prism, and focuses on the duplicative damages claims in both suits as raising the possibility of a windfall to plaintiff, rather than any sort of overlapping coverage under multiple insurance policies.

Despite the flaws in defendant's reasoning seeking a 50% reduction under *Koppers,* it stands to reason that some portion of the clean-up costs awarded by the jury in this case were encompassed by the settlements in the Massachusetts action. UTC alleged in both cases that its liability insurers were responsible for clean-up costs on owned property, and some of its claimed expenses—for instance, payments to remediation contractor Dames & Moore—were nearly identical in both actions. *Compare* Trial Ex. 809A (seeking compensation for payments to Dames & Moore of $9.7 million) *with* Def.App. Tab E (1991 Pre-Trial Statement from Massachusetts action listing Dames & Moore expenses as $8.4 million). Twenty-one of the settlement agreements reviewed by the Court, accounting for 31.5% of the settlement payments received, were entered into prior to the summary judgment ruling dismissing Windsor Locks from the case, and one of these settlement agreements specifically includes Windsor Locks in an attachment listing all sites released, although it is but one of hundreds of sites listed. The question is whether an equitable means of determining the setoff amount can be fashioned which is not fatally speculative.

Perhaps recognizing the shortcomings in its 50% setoff proposition, in a later filing American Home suggested a more creative approach that calculated the ratio between the losses UTC claimed in this trial and the amounts it claims it spent overall in environmental remediation, and then applied this percentage to the settlement amount. *See* Doc. #1121 at p. 8 (Post–Hearing Response of Defendant American Home to UTC's New Evidence and Argument Presented at the Hearing on American Home's Motion to Reduce the Windsor Locks Verdict). American Home contends that this calculation provides a means of determining what portion of the settlement is properly attributable to remediation at Windsor Locks, based on UTC's own allegations. This approach, while more tenable than the proportionate share reduction, also fails to account for the summary judgment ruling discussed above. While American Home argues that the post-summary judgment settlements could be considered to have encompassed Windsor Locks due to "appeal risks" of

that decision, such an amount is unquantifiable, and too speculative. The Court therefore will consider only those settlement amounts received pursuant to agreements signed before the summary judgment ruling dismissing Windsor Locks from the Massachusetts action. With these modifications in mind, however, the formula advocated by American Home in its Post–Hearing Response does provide a starting point that would allow the Court to equitably calculate the appropriate set-off here.

At oral argument, UTC sought to use evidence regarding its total expenditures for environmental remediation as proof that no double recovery occurred in this case. American Home objected to this line of argumentation, rightfully so, because the appropriate measurement of the loss is *not* what the insured claims, but what the jury awards as a verdict. The numbers provided by UTC do, however, enable the Court to estimate the portion of its overall remediation costs that went to clean-up activities at Windsor Locks, which is a different proposition. According to the Affidavit of Gregory Blessing, UTC's Manager of Environmental Remediation, UTC's past costs for environmental remediation company-wide totaled $521,672,200, with $399,477,200, or 76.8%, attributable to clean-up activities on owned property. When considered as a proportion of the total costs expended on clean-up activities for owned property, the verdict in this case of $14,131,094 represents 3.5% of the total amount UTC claims it spent on environmental remediation.

Turning to the settlement agreements, UTC received $110 million for releasing its claims against the insurers in the Massachusetts and Carrier actions, which involved owned and non-owned property. Applying the percentage arrived at above for determining the portion of UTC's total costs spent on remediation on its owned property, the Court can infer that 76.8% of this amount, or $84.48 million, would be attributable to costs for owned property.

This amount needs to be further reduced to account for the summary judgment ruling, which dismissed the Windsor Locks site from the case. The Court's *in camera* review of the settlement agreements disclosed that $34,760,000, or 31.5% of the total amount, was received in settlement prior to August 3, 1993, the date of Judge Murphy's decision. Applying this percentage to the $84.48 million that could be attributed to owned property results in a figure of approximately $26.6 million that could include recovery of costs allocable to Windsor Locks.

Because this amount could also be attributable to the other sites at issue in the Massachusetts action, however, the Court must next determine whether there is a means of reducing the $26.6 million figure to a more precise number that represents the reasonable portion of the pre-summary judgment settlement amount which covered the Windsor Locks site. As noted above, the ratio between the total costs UTC claims it spent on environmental remediation and the amount it claimed at trial for Windsor Locks is 3.5%; applying this percentage to the $26.6 million results in an amount $931,392. Accordingly, the Court will reduce the verdict by $931,392, a figure arrived at by calculating the proportion between the costs claimed for Windsor Locks and the costs claimed for owned property overall, and applying that same percentage to the settlement, reduced to account for the fact that non-owned property was also settled and the summary judgment ruling.

This formulation is by no means a model of slide rule precision, given the dearth of information before the Court and the very general language of the settlement agreements reviewed *in camera*. While plaintiff would have the Court hold this shortfall to defendant's account, the fact remains that UTC is the one party with access to the evidence necessary for the Court to accurately calculate or deny an appropriate setoff, and it was also the party that could have drafted the settlement

agreements in such a way to ensure that settlement payments were allocable to particular claims or sites. *See Litho Color v. Pacific Employers Ins. Co.*, 984 P.2d 461 (Ct.App.Wash.1999) (deducting entire settlement from verdict, because of Washington rule that plaintiff bears burden of allocating settlement); *Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 2000 WL 72142 (January 27, 2000, Texas) (explaining Texas rule requiring that once a non-settling defendant has demonstrated that the plaintiff received settlement funds on claims for which both the settling and non-settling defendant were jointly liable, the plaintiff bears the burden of demonstrating that the settlement was received for claims on which only the settling defendant was liable).

The Court will tolerate a fair amount of approximation in deciding the appropriate reduction to be taken. In a different context, the Second Circuit has directed district courts to consider notions of fairness and "rough justice" in traversing the "Serbonian Bog" of proximate cause. *AUSA Life Ins. v. Ernst & Young*, 206 F.3d 202, 217 (2d Cir.2000), *citing Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 352, 162 N.E. 99 (1928). The Court views the calculation arrived at above as an appropriate and adequate formula for rough justice, and the quagmire created by the various settlements and different policy provisions in this case could just as surely swallow an army, as the Serbonian Bog was reported to have done by Herodotus. Although the Court has rejected defendant's arguments premised on cases involving joint tortfeasors or multiple triggered policies providing coverage for indivisible losses, nonetheless the Court recognizes that Connecticut law frowns upon a double recovery, and the history and circumstances of this case suggest that some amount of double recovery is likely, albeit at a mere fraction of the proportion claimed by defendant. The above calculation seeks to take all these issues into consideration, and provide a means for allocating the global settlement in the

Massachusetts action against the various sites that will be tried individually in this Court.

## II. CONCLUSION

For the reasons outlined above, the verdict will be reduced by $931,392 to $13,199,702. Defendant's Motions for a Reduction in the Jury's Windsor Lock's Verdict (Docs. #1013 and #1020) are therefore GRANTED.

IT IS SO ORDERED.